378

[No. 62677-4. En Banc.]
Considered July 9, 1998. Decided February 18, 1999.
*In the Matter of the Personal Restraint of* JONATHAN LEE GENTRY, *Petitioner.*

382

*Finegold, Zulauf & Engelhard,* by *Scott J. Engelhard;* and *Meredith M. Rountree,* for petitioner.

*Russell D. Hauge, Prosecuting Attorney,* and *Pamela B. Loginsky, Deputy,* for respondent.

TALMADGE, J. — Jonathan Gentry was sentenced to death for the aggravated first degree murder of 12-year-old Cassie Holden. We affirmed the conviction and sentence, and the United States Supreme Court denied Gentry's petition for certiorari. *State v. Gentry,* 125 Wn.2d 570, 888 P.2d 1105, *cert. denied,* 515 U.S. 843 (1995). Gentry's personal restraint petition (PRP) is now before us, as well as numerous motions Gentry and the State filed during the pendency of this PRP and which we have passed to the merits. The PRP renews many of the claims we rejected on appeal. We

decline to reach those issues already resolved on direct review. The PRP also raises several additional issues. We find the new issues Gentry raises to be without merit. We deny Gentry's PRP.

## FACTS

To place the issues in this case in appropriate context, we briefly review the facts of the case. Cassie Holden was beaten to death with a heavy rock in a wooded area adjacent to Rolling Hills Golf Course in Bremerton. Her shirt had been pulled up over her head, and her pants pulled down to her knees, but there was no physical evidence that she had been raped. Witnesses reported seeing a man on the golf course trail at about the time of the murder. Their descriptions led police to Gentry, who at the time of the murder was awaiting trial on a charge of first degree rape. He was free on bail and living in his brother's home near the golf course.

In August of 1988, the Kitsap County Prosecutor obtained a search warrant for the Gentry residence that produced clothing similar to that worn by the man seen on the golf course. One pair of shoes had been recently cleaned, but there were bloodstains on the shoelaces. The prosecutor also obtained a warrant for hair and blood samples from Gentry and the trial court appointed counsel to represent him in connection with the hair and blood testing. Over defense counsel's objection, the blood samples and a "Negroid" hair found on Cassie's body were subjected to several types of testing, including DNA tests. According to the State's experts, under each of these tests, the blood on the shoelaces was the same type as the victim's blood. The same tests excluded both Gentry and his brother as the source of the blood on the shoes and excluded Gentry as the source of the hair found on Cassie's body. The hair was determined to match that of Gentry's brother Edward, who was on board a Naval vessel at sea at the time of the murder. As Gentry lived with Edward and often wore his clothes, the State concluded Gentry inadvertently trans-

ported one of his brother's hairs to the crime scene on his clothing.

The forensics tests took many months to complete. While awaiting their results, Gentry was tried and convicted on the pending rape charge and transferred from the Kitsap County Jail to the prison at Shelton. In September of 1989, jail inmate Brian Dyste told authorities Gentry made incriminating statements while they were both in the county jail. Another inmate, Tim Hicks, subsequently reported additional incriminating statements Gentry allegedly made after his transfer to Shelton. Leonard Smith, who was also at Shelton at the time, confirmed Hicks' allegation.

In February 1990, the Kitsap County Prosecutor charged Gentry with first degree murder, and later amended the information to charge Gentry with both first degree felony murder and first degree premeditated murder. As to the latter count, the State alleged three aggravating circumstances: the murder was committed to conceal the commission of a crime, to protect or conceal the identity of a person committing a crime, and during the course or furtherance of a first or second degree rape or kidnapping. The kidnapping allegation was later dismissed. The State subsequently filed a notice of intent to seek the death penalty.

Following a lengthy pretrial hearing, the trial court ruled the DNA and other forensic evidence was admissible. In addition to that evidence, the jury heard testimony from the eyewitnesses who had seen an African-American man near the scene of the crime. One of these witnesses identified Gentry as the man she had seen. Dyste, Smith, and Hicks also related the incriminating statements Gentry allegedly made to them in jail before he was charged with the murder. Each said the State had neither offered nor provided any benefits or other inducements to them to testify. The defense called several witnesses who testified the forensic examinations were flawed, both in method and application. The defense contended the State's evidence did not accurately identify Gentry as the killer, and whoever killed the victim did so without premeditation during an attempted rape.

The jury found Gentry guilty of both premeditated murder and felony murder. It also found he committed the murder to protect or conceal the identity of a person committing a crime,[1] but not to conceal the commission of a crime and not during the course or furtherance of a first or second degree rape.

Between the guilt and penalty phases of trial, the United States Supreme Court overruled two earlier cases and held that admission of "victim impact" evidence in the sentencing phase of a capital trial does not violate the Eighth Amendment. *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991). Over defense objection, the trial court allowed the State to call the victim's father to testify in the penalty phase of Gentry's trial. In addition to Mr. Holden's testimony, the State presented documentary evidence showing Gentry's prior convictions for manslaughter, rape, and two burglaries. Gentry did not testify or exercise his right of allocution, but his mother and brothers testified about his childhood, their love for him, and the loss they would feel should he be executed. The jury unanimously found insufficient mitigating circumstances to merit leniency; Gentry was sentenced to death. We affirmed the conviction and the sentence.

In his PRP, Gentry raises numerous issues he contends require us to award him a new trial or, alternatively, vacate his death sentence. In connection with the PRP, Gentry submitted the affidavits of his mother and stepfather alleging they had seen members of the jury conversing with the victim's family at the end of the first day of the penalty phase of the trial. The State submitted the affidavits of eight jurors denying any contact. Because these conflicting affidavits represented a fact question, we ordered a reference hearing to resolve the issue of juror misconduct.[2]

---

[1]The crime in question was not identified in the instructions or verdict form, but was presumably either the attempted rape conceded by defense counsel or some other sexual offense not amounting to rape (such as indecent liberties or child molestation).

[2]"The case is transferred to the superior court under RAP 16.11(b) for a reference hearing solely on Gentry's claim that one or more jurors spoke to the victim's

The reference hearing took place January 6-9, 1998, in the Kitsap County Superior Court with the Honorable George L. Wood of the Clallam County Superior Court presiding as the trier of fact. Numerous witnesses testified for both sides as to the alleged improper contact between jurors and witnesses for the State. The trial court entered findings of fact and conclusions of law on January 26, 1998, concluding no contact had occurred between any juror and any member of the victim's family or with law enforcement officials during the pendency of the penalty phase of the trial. Gentry now contends the trial court findings are unsupported and the conclusions are erroneous.

## ISSUES

1. Did the State deny Gentry a fair trial and due process of law by failing to reveal exculpatory evidence he could have used to impeach two jailhouse informants who testified against him?

2. Did Gentry receive ineffective assistance of trial counsel?

3. Did the trial court err in admitting victim impact evidence in violation of Gentry's rights under the state and federal constitutions?

4. Did juror misconduct occur during the sentencing phase of the trial?

5. Did the trial court err in giving jury instructions during the sentencing phase of the trial which violated Gentry's constitutional right to due process?

6. Did Gentry receive ineffective assistance of appellate counsel because appellate counsel did not assign error to the confusing jury instructions?

7. Did the trial court err in admitting a document evidencing Gentry's prior conviction for rape because the

family and a deputy sheriff during trial. The trial court shall enter findings of fact on the following questions only: (a) did the claimed contact occur? and, if so, (b) under what circumstances did the contact occur? The trial court shall transmit those findings to this court not later than January 30, 1998." Order of Oct. 20, 1997.

trial judge was also the trial judge who signed the judgment and sentence for rape?

8. Is the Washington death penalty statute under which Gentry was sentenced unconstitutionally vague?

9. Did the cumulation of all the previously alleged errors deny Gentry a fair trial?[3]

## ANALYSIS

 In PRPs, we ordinarily will not review issues previously raised and resolved on direct review. In order to renew an issue rejected on its merits on appeal, the petitioner must show the ends of justice would be served by reexamining the issue. *In re Personal Restraint of Vandervlugt*, 120 Wn.2d 427, 432, 842 P.2d 950 (1992); *In re Personal Restraint of Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986). This burden can be met by showing an intervening change in the law " 'or some other justification for having failed to raise a crucial point or argument in the prior application.' " *Taylor*, 105 Wn.2d at 688 (quoting *Sanders v. United States*, 373 U.S. 1, 16, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963)); *see Vandervlugt*, 120 Wn.2d at 432.

We take seriously the view that a collateral attack by PRP on a criminal conviction and sentence should not simply be reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact

---

[3]Gentry also argues in a supplemental memorandum the Court should order a new trial because the trial court improperly "death qualified" two jurors by excusing them after they stated they could not assure the trial court they would be able to follow the law in the penalty phase. *See Gentry*, 125 Wn.2d at 633-36. The basis for this renewed argument by Gentry is *Greene v. Georgia*, 519 U.S. 145, 117 S. Ct. 578, 136 L. Ed. 2d 507 (1996), a case he asserts changed the law with regard to "death qualifying" jurors.

Without addressing the timeliness of Gentry's contention under our rules for bringing new arguments in a PRP, we simply note Gentry's assertion is wrong. *Greene* did not change the law; it held only that the State of Georgia was wrong in concluding an earlier Supreme Court case on "death qualification" of jurors, *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), is controlling authority in Georgia. *Greene*, 519 U.S. at 146. Although we have adopted the reasoning of *Wainwright* in *Gentry* and other cases as *persuasive* authority, we have never referred to *Wainwright* as *controlling* authority. The Supreme Court in *Greene* neither addressed the merits of *Wainwright* nor overruled it. Likewise, Gentry neither advances new arguments why we should reject the reasoning of *Wainwright* nor offers an alternate version of what the law should be.

and law that were not or could not have been raised in the principal action, to the prejudice of the defendant. As we have noted: "To obtain relief with respect to either constitutional or nonconstitutional claims, the petitioner must show that he was actually and substantially prejudiced by the error." *In re Personal Restraint of Lord,* 123 Wn.2d 296, 303, 868 P.2d 835 (1994); *In re Personal Restraint of Rice,* 118 Wn.2d 876, 886, 828 P.2d 1086 (1992); *In re Personal Restraint of St. Pierre,* 118 Wn.2d 321, 329, 823 P.2d 492 (1992); *In re Personal Restraint of Cook,* 114 Wn.2d 802, 810, 792 P.2d 506 (1990); *In re Personal Restraint of Hews,* 99 Wn.2d 80, 87, 660 P.2d 263 (1983).

A. Parties' Motions

The parties have filed motions on a variety of questions. We have resolved the various motions by separate order. But before addressing the substantive PRP issues, we mention some of the motions here only because of their possible significance in future cases.

1. Motions to Seal

■ The State moves to unseal Gentry's motions for authorization of expenses necessary to conduct an investigation. Gentry asked that the motions be sealed under GR 15(c)(2)(B), which allows the sealing of files and records "under compelling circumstances where justice so requires." This requirement of compelling circumstances stems from the constitutional preference for open administration of justice. WASH. CONST. art. I, § 22 (amend. 10). The Constitution itself requires the proponent of closure or sealing to make a showing of a compelling interest; where that interest is based on a right other than the accused's right to a fair trial, the proponent must show a serious and imminent threat to that right. *State v. Bone-Club,* 128 Wn.2d 254, 258, 906 P.2d 325 (1995).

Gentry seems to contend that sealing his motions is necessary to protect his right to a fair trial, or, in this case, retrial upon remand; he relies on a California case involving an ex parte motion for appointment of a second trial counsel in a capital case. *See Keenan v. Superior Court,* 31

Cal. 3d 424, 640 P.2d 108 (1982) (noting state law appropriately allows such motions to be filed ex parte). But Gentry is not now seeking appointment of trial counsel; his conviction and sentence are final. The State is already aware of Gentry's defense to the charge and his theory of the case; those matters therefore cannot be "prematurely" disclosed. Gentry may be concerned the State will use, in a retrial, any unfavorable evidence he might discover, but the evidence itself would not be revealed simply by unsealing Gentry's motions. The State would learn only the avenues of investigation his current counsel are pursuing. Gentry seems to ignore the fact he is seeking discovery in order to obtain facts tending to establish his conviction or sentence should be vacated. Surely he does not believe a court would grant such relief without giving the State an opportunity to test, in an adversarial hearing, whatever evidence his planned investigation produces.

Gentry has not shown his right to a fair trial is imperiled or sealing the motions is necessary to prevent a serious and imminent threat to any other compelling interest. The motions should not have been sealed.

2. Discovery Motions

Gentry has filed numerous motions for discovery. He has asked to depose former Kitsap County Prosecutor C. Danny Clem and several Kitsap and Pierce County deputy prosecutors; to subpoena documents relating to Hicks' prosecutions; for appointment of an investigator and an expert; for payment for portions of the transcripts in other cases; and for payment of expenses counsel incurred traveling to Idaho to interview Dyste.

 Gentry claims to have a constitutional right to discovery, apparently tied to his rights to counsel and to due process. He is mistaken on both counts. There is no constitutional right to counsel in postconviction proceedings, nor to an investigator's assistance, even if the death penalty has been imposed. *Coleman v. Thompson*, 501 U.S. 722, 752, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).[4] From

---

[4]Gentry's attorneys were appointed under RCW 10.73.150.

a due process standpoint, prisoners seeking postconviction relief are not entitled to discovery as a matter of ordinary course, but are limited to discovery only to the extent the prisoner can show good cause to believe the discovery would prove entitlement to relief.[5] *Bracy v. Gramley*, 520 U.S. 899, 903, 117 S. Ct. 1793, 138 L. Ed. 2d 97, 103 (1997). As the Ninth Circuit recently held, "there is simply no federal right, constitutional or otherwise, to discovery in habeas proceedings as a general matter." *Campbell v. Blodgett*, 982 F.2d 1356, 1358 (9th Cir. 1993) (upholding the denial of Campbell's request for discovery regarding Dodd's execution); *see Spencer v. Hopper*, 243 Ga. 532, 255 S.E.2d 1 (1979) (no right to appointment of experts or investigators in habeas corpus proceedings, even in death penalty cases).

Gentry attempts to find additional support for his requests in Justice O'Connor's opinion in a case construing a federal statute, *McFarland v. Scott*, 512 U.S. 849, 859, 114 S. Ct. 2568, 129 L. Ed. 2d 666 (1994). Justice O'Connor's opinion is a concurrence/dissent, however, in a case involving interpretation of a federal statute inapplicable to state court proceedings. Moreover, the case did not involve a request for discovery or appointment of an investigator or expert.

There is currently no rule for discovery at the appellate court level, however, either to further support the allegations in a PRP as filed or to obtain evidence to support new claims.[6] But we have inherent "power to issue . . . all other writs necessary and proper to the complete exercise of its . . . jurisdiction." CONST. art. IV, § 4. Pursuant to such authority of the courts, RAP 16.15(h) authorizes ap-

---

[5]Claims must be specific to the petitioner's own case. *Bracy*, 520 U.S. at 905-06, 909. *See also Montoya v. Scott*, 65 F.3d 405, 417 (5th Cir. 1995) (to establish good cause under that rule, the "petitioner's allegations . . . must be specific and may not be speculative or conclusory.").

[6]A court rule adopted after the filing of Gentry's PRP would allow for discovery if an individual under sentence of death establishes facts that give rise to a substantial reason to believe the discovery will produce information that would provide grounds for relief under RAP 16.4(c). RAP 16.26(c). Another new rule allows appointment of experts or investigators under the same standard, but only if the legislature authorizes and approves funding for such services. RAP 16.27. These rules do not apply here.

pointment of counsel in PRPs, and allows for the "payment of such other expenses as may be necessary to consider the petition in the appellate court." We believe discovery may be allowed under this rule only in rare circumstances where the petitioner can demonstrate a substantial likelihood the discovery will lead to evidence that would compel relief under RAP 16.4(c). Claims must be specific to petitioner's own case.

██ ██ Further, while RCW 10.73.150(3) provides for the appointment of counsel at state expense for indigents to pursue collateral attacks on death sentence verdicts, it does not authorize public funds for investigators in such cases. Gentry claims CrR 3.1, incorporated into the appellate rules by RAP 16.15(f), mandates the appointment of an investigator at public expense. But CrR 3.1 is permissive, not mandatory: "Upon finding the services [of an investigator] are necessary and that the defendant is financially unable to obtain them, the court, or a person or agency delegated by local court rule shall authorize the services." CrR 3.1(f)(2). There was no such finding in this case.

 There are few published decisions involving requests for appointment of investigators or experts in connection with postconviction proceedings. Two courts have held that an expert should be appointed to perform DNA testing if the defendant consistently maintained his innocence, the victim's identification testimony was challenged, and the testing could conclusively prove the defendant's innocence. *Jones v. Wood*, 114 F.3d 1002, 1009 (9th Cir. 1997); *Commonwealth v. Reese*, 444 Pa. Super. 38, 663 A.2d 206, 208-09 (1995). But none of these cases authorize either discovery such as depositions, or the appointment of investigators or experts to identify or develop grounds for challenging convictions or sentences. They merely allow the defendant to interview known witnesses or to obtain or test existing evidence in the government's possession. They also require a showing there is reason to believe a specific discovery request will support a particular, identified claim for relief.

We note in this case Gentry has not established a basis

for discovery and appointment of experts. Gentry first wants to retain Dr. Stephen Cummings to conduct a psychological evaluation because he believes Dr. Cummings could determine whether Gentry suffered from posttraumatic stress disorder or other similar condition at the time of the offense arising from Gentry's, when a young boy, witnessing his mother kill his father. Even if he could do so, that conclusion is not grounds for relief because it is not tied to a particular legal claim.

Moreover, Dr. Cummings provides no concrete reason to believe Gentry suffered from posttraumatic stress disorder at the time of the murder. According to Dr. Cummings' declaration, children who witness traumatic events are susceptible to posttraumatic stress disorder, which can cause significant distress or impairment in important areas of functioning. Dr. Cummings also states persons with the disorder can experience recurrent intrusive memories of the trauma and disassociate for periods of time during which they behave as though experiencing the traumatic event. He does not say that all witnesses to trauma develop the disorder. And conspicuously absent from the record is an affidavit from Gentry himself claiming to have suffered disassociation, recurrent nightmares, or any of the other symptoms mentioned by Dr. Cummings. Additionally, several witnesses who testified at the penalty phase said the family did not talk about Gentry's father's death. They also testified Jonathan was a quiet child, not very outgoing, who was kind and nice. No witness suggested Gentry suffered from the symptoms described by Dr. Cummings.[7]

Gentry's counsel want to examine Gentry's school and criminal records in an effort to locate anything that could have been presented in mitigation. This investigation is not in aid of an identified claim, nor do counsel state any reason to believe they will find anything to support a claim for relief.

---

[7]Apparently aware of the paucity of evidence on this issue, Gentry has filed a separate motion seeking authorization for payment of funds for an investigator to travel to Florida to interview family members and others who knew Gentry as a child.

Gentry's counsel also requested funds to go to Idaho to interview Dyste, apparently in the hope that he would "admit" that he was paid to testify against Gentry. They have since taken that trip, for which they now seek reimbursement. Their failure to provide us a statement from Dyste indicates he did not, in fact, provide them with any helpful information.

Gentry's attorneys also want to depose various Kitsap and Pierce County Prosecuting Attorneys, apparently about Dyste or other informants, and to continue their investigation of Detective Wright. Some of these persons have already submitted affidavits. Most, if not all, of the others could be interviewed and asked to provide written statements. Gentry has not, in any event, shown that deposing any of these persons is likely to support any identified claim for relief.

In summary, Gentry fails to establish a basis to support his request for discovery or appointment of an investigator or additional experts. His requests do not allege a specific connection to legal theories he advances, evidencing only a speculative relationship to his theories. We deny Gentry's motions for discovery and appointment of investigators or experts as we will not condone a fishing expedition to pore over every aspect of the case, no matter how minute or insubstantial the connection to the claims advanced.

3. Motions to Supplement Record

Gentry moves to supplement the record with various materials his attorneys discovered in their postconviction investigation. Counsel apparently spent a great deal of time investigating Kitsap County Deputy Sheriff Douglas Wright. From old newspaper stories, they learned Wright was terminated from another police job in 1977 because of his involvement in the investigation of a close friend. They apparently want to include these records, and part of the transcript on the related criminal prosecution of Wright's friend, in the record for this case. Counsel also have evidence Wright made false statements in support of a search warrant in another criminal case; and a fellow officer recently signed an affidavit questioning his veracity.

 Gentry claims this evidence will enable him to show Wright lied in the search warrant application for the Gentry home. Gentry moved to suppress the evidence found in his brother's house on the ground Wright lied in the search warrant application. The trial court heard testimony on that issue from Wright and others and found Wright had not lied, but that even if he had, excising the assertedly false statements from the warrant did not render it invalid. We affirmed both of these holdings, and specifically agreed with the trial court that the warrant was valid even if the assertedly false statements are excised from the application. *State v. Gentry*, 125 Wn.2d at 605-07. The additional evidence Gentry offers regarding Wright's veracity would not alter that outcome.

Gentry also wants to supplement the record with portions of the transcript of the federal habeas hearing in the *Lord v. Wood*, No. C94-464 (W.D. Wash. Aug. 20, 1997), the federal habeas corpus action involving convicted murderer Brian Lord. *See State v. Lord*, 117 Wn.2d 829, 822 P.2d 177 (1991), *cert. denied*, 506 U.S. 856, 113 S. Ct. 164, 121 L. Ed. 2d 112 (1992). In the part of the record at issue, a witness testified that Sonny Belgarde, one of the informants against Lord, testified under a "deal" with Kitsap County Prosecutor Clem.[8] Although Belgarde was not a witness against Gentry, counsel claim this evidence supports their theory the Kitsap County prosecutor's office regularly gives "deals" to informants, and therefore also gave deals to the informants in Gentry's case. This theory is wholly speculative. All of the informants against Gentry have denied any deals existed, as have the prosecutors and police officers involved. Showing that a different informant was given a deal would not impeach that evidence or prove that these informants were given deals. We deny Gentry's motions to supplement the record.

---

[8]District Court Judge Barbara Rothstein recently found that no such deal existed. Order Granting in Part and Denying in Part Petition for Writ of Habeas Corpus at 33 in *Lord v. Wood*, No. C94-464 (W.D. Wash. Aug. 20, 1997) (attached to State's Submission to the Ct. Pursuant to Jonathan Lee Gentry's Req. that the Ct. Consider Judge Rothstein's Findings of Fact on Lord's Claim, dated Aug. 22, 1997).

B. PRP Issues on the Merits
1. Failure to Reveal Exculpatory Evidence

■■■ Due process requires the State to disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)). There is no *Brady* violation, however, "if the defendant, using reasonable diligence, could have obtained the information" at issue. *In re Personal Restraint of Benn*, 134 Wn.2d 868, 916, 952 P.2d 116 (1998).

Moreover, evidence is "material" and therefore must be disclosed under *Brady* "only if 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Bagley*, 473 U.S. at 682; *Benn*, 134 Wn.2d at 916. In applying this "reasonable probability" standard, the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *Benn*, 134 Wn.2d at 916. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). Gentry contends the State failed to reveal evidence he could have used to impeach Dyste, Hicks, and Smith. Gentry allegedly admitted to Dyste in the Kitsap County jail and to Hicks and Smith in a card game at Shelton that he killed Cassie Holden. Each of the witnesses was subjected at trial to extensive cross-examination and, in some instances, defense counsel impeached the witnesses with extensive criminal histories. Each witness denied receiving anything of value from the State in exchange for his testimony.

Gentry's current counsel have appended several documents to the PRP that allegedly show Smith, Hicks, and Dyste lied when they said they received no benefit for

testifying. The defense also argues Hicks and Smith conspired to give false testimony against Gentry.[9]

The prosecution provided Gentry's trial counsel with the informant's criminal histories, including the cause numbers on their prior convictions. Gentry's current attorneys used that information to obtain many of the court documents they now characterize as *"Brady* materials." These additional documents were as accessible to trial counsel as they were to Gentry's current counsel. Significantly, the trial court authorized appointment of a defense investigator who, according to the bills submitted to the court clerk, spent some of his time interviewing the informants. The court records of their prior convictions, plea bargains and the like, were not withheld from the defense.

The materials Gentry has provided with his PRP are not relevant, particularly with respect to the guilt phase verdict. Several of the documents he has obtained are pleadings filed in drug cases in which Dyste acted as an informant. These materials show only that Dyste was paid for his services in the drug cases and received some consideration in sentencing for at least one conviction because of his services as a drug informant.[10] Gentry interprets some of these documents to show Dyste also benefited because he testified in Gentry's case. There is evidence a Pierce County prosecutor in a 1994 case considered Hicks's testimony in Gentry's case as a reason to recommend a low-end standard range term. It is entirely speculative that there was an agreement in 1991 Dyste would be compensated for his testimony against Gentry with a favor

---

[9]Many of these documents record events that occurred after Gentry's trial, and therefore could not have been revealed before trial. Even after conviction, however, the prosecutor is required by the ethics of the office " 'to inform the appropriate authority of . . . information that casts doubt upon the correctness of the conviction.' " *People v. Gonzalez*, 51 Cal. 3d 1179, 800 P.2d 1159, 1206, 275 Cal. Rptr. 729 (1990), *cert. denied*, 502 U.S. 835 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)).

[10]Gentry does not claim Dyste was acting as a police agent while they were jailed together. Such a claim would be relevant in any event only if Gentry had been charged with the murder before their contact. Had that been so, Dyste's "interrogation" of Gentry would violate his right to counsel. *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964).

able sentencing recommendation should he commit and be convicted of another crime in the future. Moreover, this assertion is contradicted by the deputy prosecuting attorney's affidavit.

▆▆▆ Gentry also relies on a notation in the Pierce County prosecutor's file that Kitsap County Deputy Prosecutor Brian Moran recommended against leniency in the Pierce County case because Dyste had already benefited from his testimony in the Gentry case. That statement is hearsay, and therefore inadmissible even to obtain an evidentiary hearing. *In re Personal Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). Moran has responded with his own affidavit denying making the statement and also denying Dyste received or was promised any benefit for testifying against Gentry.

There is also no circumstantial evidence the informants benefited from their testimony. All of the informants had already been sentenced before they made any statements about Gentry. Their agreements to testify therefore could not have been part of any plea or sentencing agreement. Because Dyste and Smith were serving determinate terms, the prosecutor could not have promised to seek their early parole. Hicks did ask the prosecutor to help him clarify his parole status (the relationship between his pre-SRA (Sentencing Reform Act of 1981) convictions and his determinate sentences). And the prosecutor did make an inquiry on his behalf. The Indeterminate Sentence Review Board then realized it had failed to take any action in Hicks' case since it suspended his parole several years earlier. The Board then reinstated his parole on the pre-SRA convictions, thus allowing the sentences for those crimes to run concurrently with his SRA terms. Although that ruling benefited Hicks, the Board did not reverse any prior decision, but simply acted on a long-pending parole matter. The benefit to Hicks from the Board's finally taking action was not a quid pro quo for his testimony in Gentry's case. The prosecutor neither asked the Board to grant Hicks leniency, nor did the Board base its decision on

Hicks' role in Gentry's case. According to the Board itself, it reinstated his parole for several other, unrelated reasons including its failure to hold a timely parole revocation hearing.

Gentry also notes Hicks was transferred to a less secure facility about the time of his testimony in Gentry's case, but the record indicates Hicks was transferred so he could complete his college degree at a nearby school, not because of his testimony against Gentry.

Gentry's claim of a conspiracy between Hicks and Smith is supported by the statements of Donald Peck, who is currently an inmate at Walla Walla. Peck says he was at Shelton in late 1989 or early 1990, and he knew Gentry, Smith, and Hicks (who was using the name Doug Baker). Peck claims he heard Smith and Baker (Hicks) planning to get revenge against Gentry because he had failed to pay his poker debts. The State provides Smith's declaration denying any such conversation occurred, or that there was any such plan. Peck does not claim to have told the prosecutor or any other agent of the State about this alleged plot in time for Gentry's trial counsel to be informed of it, however. To the contrary, he says he was unaware the inmates had testified against Gentry until after the trial. At that point, Peck says, he wrote to Gentry explaining what he had overheard. Gentry does not say he passed this information on to his appellate counsel. Thus, as far as can be determined, no agent of the State was aware of Peck's allegations until Gentry filed his PRP.

*Brady* requires only that prosecutors discover and disclose "any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. at 437. While the prosecution cannot avoid *Brady* by keeping itself ignorant of matters known to other state agents, *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997), the State has no duty to search for exculpatory evidence. *State v. Judge*, 100 Wn.2d 706, 717, 675 P.2d 219 (1984). Thus, since no state agent ever possessed the information contained in

Peck's affidavit, it is not *"Brady* material." *Rice,* 118 Wn.2d at 888.[11]

Moreover, proving Smith and Hicks planned to get revenge against Gentry only would have given the jury an additional reason to doubt their testimony regarding Gentry's admissions. The defense was able to impeach their credibility with their extensive criminal histories, including Hicks' conviction for perjury. Smith admitted Hicks named him as a person who was at the card table and had information about the murder. And Hicks admitted he could have learned many of the details about the murder from television and newspaper stories. The witnesses were, to that extent, effectively impeached. Whether because of that impeachment or simply because it found Hicks incredible, the jury did not credit his claim Gentry admitted having sex with the victim. It acquitted Gentry of the rape allegation, finding at most an attempted rape, which defense counsel conceded had been proven.

In conclusion, some of the evidence Gentry has provided could readily have been discovered by trial counsel or was not known to the State. Some of the evidence could have been used to impeach one or more of the informants, but in the light of all the circumstances, we cannot say the unavailability of this minimal additional impeachment "actually and substantially prejudiced" Gentry. *Lord,* 123 Wn.2d at 303.

2. Ineffective Assistance by Trial Counsel

 Gentry claims his trial counsel represented him ineffectively by failing to discover the evidence his current attorneys obtained regarding the informants, failing to consult with forensics experts, proposing confusing penalty phase instructions, failing to offer a "redacted" judgment and sentence form on Gentry's rape conviction, and failing to present psychological evidence in mitigation. To prevail on this claim, Gentry must show that his attorneys were

---

[11]Gentry seeks relief on this part of his nominal *Brady* claim under RAP 16.4(c)(3), which applies to newly discovered evidence. This "new" evidence would therefore appear to be "merely impeaching" as to Hicks and Smith, and not admissible under that rule.

"not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and their errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *Benn*, 134 Wn.2d at 889; *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286, 50 A.L.R.5TH 921 (1995).

Trial counsel could have discovered Dyste's role as a drug informant, but as discussed above, that involvement was irrelevant to this case. Gentry was not prejudiced by counsel's failure to pursue that issue. Counsel could perhaps have shown Hicks' prison transfer and parole gave him a motive to favor the State, but there is no evidence of any bargain or offers of benefits related to his or the other informants' testimony against Gentry. Finally, Peck did not reveal the alleged conspiracy between Hicks and Smith to seek revenge against Gentry until after trial. Gentry offers no reason why counsel should have interviewed Peck before trial. The defense did interview Gentry himself, as well as Hicks, Smith, and Dyste.[12] Nothing in the information Gentry has provided indicates any of these men identified Peck as a possible witness. Unless counsel were aware of some specific reason to talk to Peck, or they were required to interview all of the inmates who were incarcerated at the same time as Gentry, Hicks, and Smith, their failure to do so was not deficient. "We address not what is prudent or appropriate, but only what is constitutionally required." *United States v. Cronic*, 466 U.S. 648, 665 n.38, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L. Ed. 2d 638 (1987).

Even if a more thorough investigation were constitutionally required, the representation Gentry received did not deprive him of "a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. As discussed above, counsel extensively cross-examined all three informants about their criminal histories and discrepancies in their statements.

---

[12]Some interviews were conducted by one or the other of Gentry's attorneys, and others by the defense investigator.

And the State's case relied much more on the forensic evidence than on the informants' testimony.

Next, Gentry faults his attorneys for failing to consult with a forensics expert regarding the cause of Cassie's two most serious head injuries and for failing to consult with an expert regarding the DNA evidence. We note initially Gentry's trial counsel vigorously contested the forensic evidence and the trial court conducted a six-week pretrial hearing on DNA evidence. Gentry contends trial counsel should have consulted with an appropriate head injury expert. Defense counsel have now located a witness who says he might, after examining the evidence, be able to testify that the wound on the back of Cassie's head was not caused by a separate blow with the rock, but by her head being pushed back into a tree or branch when she was hit in the forehead.

Gentry apparently wants to show Cassie was neither struck with the rock in the back of the head nor struck so hard in the front of the head that her head broke the branch under her head. His expert opines she may have been resting against a nearby tree when she was hit in the forehead, and the back of her head was injured by striking the tree. The expert also suggests that the branch was broken by the officer who moved it or in some other manner than the investigating officer concluded.

It is inconceivable pursuing this line of investigation and introducing such testimony would have altered the outcome of trial. It is undisputed Cassie was struck between 8 and 15 times with a two-pound rock, including one blow in the forehead, through her sweatshirt, with sufficient force to cause a fatal injury. She also suffered an independently fatal injury to the back of her head. It hardly matters whether that injury was caused by a separate blow with the rock, or the blow to the front of her head was so hard as to cause two massive wounds.

Gentry's trial counsel retained several experts who testified the type of tests the State performed are not accepted in the scientific community, and the State's witnesses' conclusions were flawed. Gentry is now claiming they

should also have presented expert testimony disputing the State's expert's calculations of the numerical "match" between Cassie's blood and the blood on Gentry's shoe, and between the "Negroid" hair on her body and Edward Gentry's hair. The State's experts testified the blood type on the shoe matched that of about .25 percent of the Caucasian population (including Cassie), and the DNA on the hair matched 6 percent of the black population (including Edward Gentry).

According to Sandy Zabel, the expert located by Gentry's current attorneys, the proper comparison for the blood is with the entire population, not just Caucasians. By her calculations, the DNA on the shoe matched about 1.8 percent of the entire population (1 in 55). That is still a closer match than the hair to Edward Gentry, and very damaging to Gentry.

With respect to the hair, Zabel says the jury should have been told there was about a 45 percent chance either Edward or Jonathan Gentry would match at least one of the two hairs found on Cassie's body. That conclusion seems to be premised on a theoretical comparison of two random persons to two unknown hairs, rather than to the facts of this case. One of the hairs on Cassie's body was from a Caucasian person. Thus, as the jury was told, it could not have come from either Gentry brother. The DNA testing also excluded Jonathan Gentry as the source of the Negroid hair, again as the jury was told. Thus, whatever the theoretical odds of either Gentry brother matching two unidentified hairs, there was in fact a zero percent chance either man was the source of the Caucasian hair or Jonathan Gentry was a source of the Negroid hair. The only relevant remaining question was whether Edward Gentry could have been the source of the Negroid hair. It was not misleading to tell the jury that the DNA in that hair matched that of Edward and 6 percent of the black population. Gentry's trial counsel made no errors here.

Although Gentry now claims ineffective assistance of counsel at trial because no psychological expert evaluated him, the record shows trial counsel sought and obtained an

order appointing psychologist Dr. Frederick Wise to evaluate Gentry in preparation for the penalty phase. No expert testified at trial, but nothing in the record suggests trial counsel failed to obtain the authorized evaluation. Both trial counsel have submitted affidavits in support of the PRP. Although counsel's affidavits address many of the allegations in Gentry's ineffective assistance claim, they say nothing about whether Dr. Wise evaluated Gentry or why no expert testimony was presented. Gentry himself is also silent on these questions. Nor has he submitted a statement from Dr. Wise. It is possible an evaluation was performed that provided no evidence useful to the defense or that counsel were concerned about opening the door to damaging rebuttal. In any event, the record before us does not support Gentry's current attorneys' claim that trial counsel neglected the issue.

In summary, Gentry's trial counsel were not deficient in failing to consult additional experts to a degree that deprived Gentry of a fair trial.

### 3. Jury Instructions Were Not Confusing

Gentry next complains his trial counsel failed to review the jury instructions "To Minimize Confusion" or to request instructions "Regarding Collective Consideration Of Mitigating Circumstances." PRP at 119. The court gave several instructions dealing with mitigating circumstances. It began by telling the jury the State had the burden to prove beyond a reasonable doubt "that there is not a sufficient mitigating circumstance to merit leniency" and Gentry "does not have to prove the existence of any mitigating circumstance or the sufficiency of any mitigating circumstance." Report of Proceedings at 5782. Another instruction told the jury it would be satisfied beyond a reasonable doubt if it had "an abiding belief that there is not a sufficient mitigating circumstance to merit leniency." *Id.* at 5783. The court told the jury it was required to answer one question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a

reasonable doubt that there is [sic] not sufficient mitigating circumstances to merit leniency?" *Id.*[13] Gentry challenged this last instruction on direct appeal and we found no error. *State v. Gentry*, 125 Wn.2d at 647-48.

Gentry claims the jury instructions the trial court issued during the sentencing phase of his trial were so confusing they denied him due process of law and violated the Eighth Amendment. In particular, he claims confusing wording in the several instructions regarding mitigating evidence baffled the jury.

The Legislature has statutorily prescribed the ultimate jury question in the sentencing phase of a death penalty case. RCW 10.95.060(4) reads:

> Upon conclusion of the evidence and argument at the special sentencing proceeding, the jury shall retire to deliberate upon the following question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?"

This provision is not unconstitutionally vague. *State v. Benn*, 120 Wn.2d 631, 845 P.2d 289, *cert. denied*, 510 U.S. 944, 114 S. Ct. 382, 126 L. Ed. 2d 331 (1993). Nor does it improperly place the burden of proving mitigating circumstances on the defendant; the State bears the burden of proving the absence of mitigating factors beyond a reasonable doubt. *State v. Rupe*, 101 Wn.2d 664, 701, 683 P.2d 571 (1984). The trial court gave the statutory instruction in slightly altered form:

> The question you are required to answer is as follows:
>
> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt

---

[13]Instruction No. 5, proposed by Gentry, then defined mitigating circumstance as a fact about the defendant or the offense which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability. This instruction also directs the jury to "consider as mitigating circumstances any other factors concerning the offense or the defendant that you find to be relevant, including, but not limited to" the likelihood Gentry will pose a danger to others, the circumstances surrounding his father's death, or the impact of his death sentence on him and his family. Report of Proceedings at 5784.

that there *is* not sufficient mitigating circumstances to merit leniency?

Clerk's Papers at 2613 (Instruction No. 4) (emphasis added).[14]

Gentry now claims the incorrect and ungrammatical change from the statutory language of this instruction created jury confusion because of other instructions the trial court gave. For instance, he argues, while part of Instruction No. 1 reads, "During these special sentencing proceedings, the State bears the burden of proving beyond a reasonable doubt that there *are* not sufficient mitigating *circumstances* to merit leniency," Clerk's Papers at 2608 (emphasis added), part of Instruction No. 3 reads, "During this sentencing phase proceeding, the State has the burden of proving to you beyond a reasonable doubt that there *is* not *a* sufficient mitigating *circumstance* to merit leniency." Clerk's Papers at 2612 (emphasis added). Instruction No. 6 reads, "The defendant is not compelled to testify, and the fact that the defendant has not testified cannot be used to infer that there *is* not sufficient mitigating *circumstances* to merit leniency, and should not prejudice him in any way." Clerk's Papers at 2615 (emphasis added). The Special Verdict Form correctly stated the statutory language in the plural.

Gentry argues "repeated use of the singular presented the jury with an unconstitutional option for considering and giving effect to mitigating circumstances. . . . The jury was never instructed to consider the mitigating circumstances cumulatively." Br. of Pet'r at 173, 175. Gentry seems to be saying the jury is supposed to consider all the mitigating circumstances and even if no single one is sufficient to merit leniency, all taken together might. But the statute itself does not require cumulation of mitigating circumstances; nor does it forbid it. We are unwilling to channel jury deliberations by applying a judicial gloss to the

---

[14]The trial court also read the instruction to the jury using the word *is* instead of *are*. Report of Proceedings at 5783.

wording the Legislature chose to employ in death penalty questions. We considered and rejected similar arguments in *State v. Pirtle*, 127 Wn.2d 628, 678, 904 P.2d 245 (1995), and *In re Personal Restraint of Rice*, 118 Wn.2d 876, 896, 828 P.2d 1086 (1992), and do so again here.[15]

4. Ineffective Assistance of Appellate Counsel

Gentry asserts his appellate counsel was unconstitutionally ineffective for failing to argue on direct appeal the jury instructions were confusing. His appellate counsel agrees, declaring under oath, "I believe my omission of the claim described above fell below the objective standard of care of reasonably effective assistance of counsel on appeal." Br. of Pet'r, Ex. 61, ¶ 10. We have decided the jury instruction contention on its merits. Gentry's ineffective assistance of counsel claim therefore fails.

5. Admission of Victim Impact Evidence

One of the State's witnesses in the sentencing phase was the victim's father, Frank Holden. He testified Cassie lived with him and his second wife in Pocatello, Idaho, and had been visiting her mother in Bremerton when she was killed. Holden testified about the things Cassie liked to do, such as reading, playing various sports, and drawing flowers. When she was 10, she and Holden participated in a father/daughter ski race in Snowberg, Utah. Holden said Cassie talked about being a writer, getting married, and having twins. After her death, he found flowers she had put in a book. He thinks about Cassie every day, and the first thing he does every morning is look up and say hello to her.

In protesting the admission of Holden's testimony, Gentry asserts he was prejudiced because his trial counsel prepared for trial in reliance on state and federal law existing at the beginning of the trial that prohibited admission of victim impact evidence. The State was able to call Holden

---

[15]Any confusion over the use of a singular mitigating circumstance would be to Gentry's advantage anyway. For instance, if a single juror had concluded just one of many possible mitigating circumstances merited leniency, even if the cumulation weighed against leniency, there would have been no death penalty verdict.

only because the United States Supreme Court overruled prior decisions during the guilt phase of Gentry's trial and allowed admission of victim impact evidence. *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991).[16] Gentry claims his inability to question jurors during voir dire about the effect victim impact testimony might have on their ability to decide the case prejudiced his right to a fair and impartial jury.

Gentry vigorously contended during his appeal the admission of this victim impact testimony was improper. We exhaustively considered and rejected his arguments. *Gentry*, 125 Wn.2d at 618-33. He now largely repeats the arguments we rejected without offering any reasons why we should reconsider them. We therefore decline to do so.

■■ He makes one new argument now. He claims for the first time allowing the victim impact statement in his trial had the same effect as an unconstitutional ex post facto law, and therefore denied him due process. Gentry cites *State v. Handran*, 113 Wn.2d 11, 775 P.2d 453 (1989), for the proposition that a change in law allowing Holden to testify violates the prohibition against ex post facto laws because it was both retroactive and disadvantageous to the offender. Br. of Pet'r at 143. Holden's testimony, to the extent it informed the jury of his personal loss, was obviously to Gentry's disadvantage.

However, *Handran* is not the law. We said in *State v. Ward*, 123 Wn.2d 488, 498, 869 P.2d 1062 (1994), following *Collins v. Youngblood*, 497 U.S. 37, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990), disadvantageous means only that which alters the standard of punishment that existed under prior law. *Accord In re Personal Restraint of Stanphill*, 134 Wn.2d 165, 170, 949 P.2d 365 (1998). Allowance of victim impact testimony simply changed a rule of evidence, and did not increase the standard of punishment Gentry faced. *Archer*

---

[16]The passage of the Victims' Rights Amendment to the state constitution in 1989 was critical to the admissibility of this kind of evidence as a matter of state law. *State v. Gentry*, 125 Wn.2d at 624-25. *Payne* then removed the federal constitution bar to admission of victim impact evidence in capital cases. *Id.* at 629.

*v. State*, 673 So. 2d 17 (Fla. 1996); *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995) (no ex post facto violation); *Washington v. Murray*, 952 F.2d 1472, 1480 (4th Cir. 1991) (retroactive application of *Payne* would not violate due process).[17] Thus, there was no violation of the prohibition against ex post facto laws in Gentry's trial.

6. Juror Misconduct

With his PRP Gentry presented affidavits of his relatives averring they saw jurors outside the courthouse speaking with Cassie Holden's father before the conclusion of the penalty phase. We referred this issue to the trial court for an evidentiary hearing. After three days of testimony, the trial court made extensive findings of fact and conclusions of law. Gentry has challenged the trial court's determination no juror misconduct occurred. Our first question is the standard of review to be applied to the trial court's determination.

■■ ■ It is well-settled a personal restraint petition is a civil matter. *In re Personal Restraint of Lord*, 123 Wn.2d 737, 739 n.2, 870 P.2d 964, *cert. denied*, 513 U.S. 849, 115 S. Ct. 146, 130 L. Ed. 2d 86 (1994). Because a PRP involves collateral review, we held in *In re Personal Restraint of Hews*, 99 Wn.2d 80, 89, 660 P.2d 263 (1983), the petitioner has the burden of establishing the claimed error more likely than not caused actual prejudice. The "more likely than not" standard is equivalent to preponderance of the evidence. WPI 21.01. The appellate rule governing review of reference hearings strongly implies our intent that the ordinary civil proceeding burden of proof is appropriate:

[17]Courts in other jurisdictions have uniformly held that *Payne* applies retroactively. *E.g.*, *Archer v. State*, 673 So. 2d 17 (Fla. 1996); *State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1996); *State v. Muhammad*, 145 N.J. 23, 678 A.2d 164 (1996); *Nooner v. State*, 322 Ark. 87; *Pennington v. State*, 913 P.2d 1356 (Okla. Crim. App. 1995); *Davis v. State*, 598 N.E.2d 1041 (Ind. 1992); *People v. Clair*, 2 Cal. 4th 629, 828 P.2d 705, 730, 7 Cal. Rptr. 2d 564 (1992). Some of these cases treat the issue as being controlled by the Supreme Court's holding that new federal constitutional rules always apply to cases pending on appeal when they are announced. *People v. Clair*, 828 P.2d at 730; *Davis v. State*, 598 N.E.2d at 1051 (both citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987)).

A decision of a superior court in a personal restraint proceeding transferred to that court for a determination on the merits is subject to review in the same manner and under the same procedure as any other trial court decision.

RAP 16.14(b). *See State v. Davis*, 25 Wn. App. 134, 138, 605 P.2d 359 (1980) ("Ordinarily, in an evidentiary hearing on a petition for postconviction relief, the proponent of factual contentions has the burden of establishing those facts by a preponderance of the evidence."). *Accord State v. Holley*, 75 Wn. App. 191, 200 n.4, 876 P.2d 973 (1994); *In re Personal Restraint of Merritt*, 69 Wn. App. 419, 424, 848 P.2d 1332 (1993). We hold the petitioner has the burden of proving issues in a reference hearing by a preponderance of the evidence.

■■ ■ Consistent with that burden, we ordinarily review factual findings in civil cases by the traditional "substantial evidence" standard of review. "In reviewing findings of fact entered by a trial court, an appellate court's role is limited to whether substantial evidence exists to support its findings." *Fred Hutchinson Cancer Research Ctr. v. Holman*, 107 Wn.2d 693, 712, 732 P.2d 974 (1987). "Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true." *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 112, 937 P.2d 154, 943 P.2d 1358 (1997), *cert. denied*, 522 U.S. 1077, 118 S. Ct. 856, 139 L. Ed. 2d 755 (1998). Because a PRP is a civil proceeding, as a matter of consistency, we adopt the "substantial evidence" standard as the standard of review for appeals from factual findings in PRP reference hearings. RAP 16.14(b).

Gentry has a heavy burden to persuade us the trial court's assessment of the conflicting evidence it heard during the reference hearing was erroneous. The trial court had the opportunity to evaluate the witnesses' demeanor and judge their credibility. *State v. Cord*, 103 Wn.2d 361, 366, 693 P.2d 81 (1985). Thus, in *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990), we said, "Credibility

determinations are for the trier of fact and cannot be reviewed on appeal." *Accord Benn*, 134 Wn.2d at 910 (credibility determinations cannot be characterized as inaccurate). Conflicting evidence may still be substantial, so long as some reasonable interpretation of it supports the challenged findings. *Ino Ino*, 132 Wn.2d at 112. That there may be other reasonable interpretations of the evidence does not justify appellate court reversal of a trial court's credibility determinations.

The trial court concluded after the reference hearing no juror misconduct occurred, giving as reasons the following: (1) Gentry's witnesses told "widely divergent stories of what occurred"; (2) Gentry's witnesses never told anybody, including Gentry, about the alleged juror misconduct, except to discuss it among themselves; (3) if contact occurred, it occurred after the trial was over; (4) the courthouse routine would have made it unlikely there was contact between jurors and Holden, and (5) it is unlikely the jurors would have violated the trial judge's daily admonitions not to speak about the case with anyone.

At the reference hearing, Gentry presented the testimony of his mother, Annie Bell Suluki; Margaret Blanchard, the mother of Gentry's former sister-in-law; his brother Edward; his first cousin, Doris Kenyada; and, by telephone, his brother, Perry. Each claimed, variously, they saw jurors conversing during the penalty phase of the trial in the parking lot with the victim's family members, particularly Frank Holden, the father. Several of these witnesses could not explain on cross-examination why they failed to raise this juror contact question earlier.

To summarize the testimony of Gentry's other witnesses, several contradictions and inconsistencies appeared. Ms. Suluki said she observed the juror misconduct from upstairs inside the courthouse, while all the other witnesses said she was standing with them outside when it occurred. It is possible, however, she observed it from inside the courthouse, and then went outside while it was still going on. Neither side elicited such testimony from her. Doris

Kenyada said she saw at least seven jurors speaking with Holden. Edward Gentry said he heard his mother say only *one* of the jurors was speaking to Holden. Ms. Suluki herself said more than one juror spoke with Holden. Perry Gentry saw only one juror speaking with Holden, and identified him as the jury foreman.

The State offered the testimony of the 11 surviving jurors, Frank Holden, and a bailiff. The jurors testified they neither spoke with Holden or anyone else nor saw any other juror speaking with Holden or anyone else prior to the end of the trial. All testified the trial judge admonished them at the end of each trial day not to speak to anyone about the trial. They all testified they took this instruction seriously.

At the end of the first day of the penalty phase, the trial judge said this to the jurors before adjournment:

> THE COURT: Ladies and gentlemen, that's all of the evidence in this phase of the trial, and so we're ready now, or will be ready to hear the Instructions of the Court that apply in this phase of the trial and to hear argument.
>
> Rather than keep you tonight, because it will be a while, obviously, once more, we'll break and we'll start a little earlier than that, but again we'll be ready for you at nine o'clock in the morning.
>
> In the mean time, I'll instruct you again that it would be improper for you to view, listen to or read any media accounts of the case, nor to discuss it at this point until it is submitted to you and you retire to the jury room for your deliberations.

Report of Proceedings at 5767. After the jury had returned its verdict, the trial judge dismissed them with these words:

> You are released from the vow of silence that we imposed early on. You may talk about this case to anybody that you wish to talk about it to now. You need not talk to anybody if you don't want to.

Report of Proceedings at 5836. Frank Holden said the prosecutors told him continually to avoid all contact with

the jury. He was aware any contact between him and a juror would result in a mistrial. He testified he had no contact with any juror prior to the end of the trial. After the trial was over, he did talk with jurors, possibly in the parking lot. After the penalty phase verdict, approximately three jurors met at Tweten's Restaurant with Frank Holden and his wife and the two prosecuting attorneys. One former juror testified he and several other jurors spoke to Holden in the parking lot after the trial had concluded. He also stated Gentry's family was there and witnessed the event. Plainly, there was substantial evidence to support the trial court's finding no juror contact had occurred with Frank Holden until after the penalty phase concluded and the jury had been dismissed.

■■ ■■ Gentry makes several objections regarding the procedure of the reference hearing. First, he claims he was denied his constitutional right to compulsory process when the trial court allowed the testimony of Perry Gentry to occur by telephone from a Florida jail rather than by videotape deposition. The deficiency Gentry claims is that the trial judge was unable to observe Perry Gentry's demeanor during his testimony. Gentry's compulsory process argument might have validity if Perry Gentry had been the State's witness. But Perry Gentry was Gentry's witness, not the State's. Gentry had the burden of proof and the burden of production. It was up to Gentry to get his brother to Kitsap County for the reference hearing if he wanted his testimony. If the videotape deposition of Perry Gentry was as vital to Gentry's case as he now claims, he should have arranged for it; he had ample time between our October 21, 1997 order setting a reference hearing and the January 6, 1998 hearing to do so. It was no process defect caused by the State that Perry Gentry was in jail in Florida and unable to attend. The alternative to taking Perry's testimony by telephone was no testimony at all. The trial court obviously had no power to subpoena an out-of-state witness who was in jail to boot.

Moreover, Perry Gentry's demeanor, no matter how sin-

cere he might have appeared visually, would probably have made little difference to the trial court. The trial court simply found it unbelievable Perry actually observed juror misconduct in July 1991 and remained silent about it until November 1997.

Second, Gentry claims the trial court drew an adverse inference from his silence at the reference hearing in violation of the Fifth Amendment. In Conclusion No. 2, the trial court, in the context of expressing the unreasonableness of the failure of all the Gentry family members who claim they saw juror misconduct to report that misconduct to Gentry's attorneys, said, "Jonathan Gentry himself offered no testimony that even he was told despite the fact that there was plenty of opportunity to make such disclosure during the penalty phase itself and subsequent thereto." Findings of Fact at 6-7. Gentry now claims this statement indicates the trial court considered his failure to testify as probative of the lack of credibility of Gentry's witnesses, and thereby improperly violates Gentry's Fifth Amendment right to remain silent.

Without discussing whether Gentry has a Fifth Amendment right to remain silent at a reference hearing held in the context of a PRP, we note the trial court's statement contains a logical disconnect. If his mother, brothers, and first cousin all testified they never mentioned the juror misconduct to Gentry, why would Gentry himself testify that at least one and maybe all of them were mistaken, and that they did indeed tell him about the juror misconduct? For Gentry to contradict his relatives in such a fashion would destroy their credibility and defeat the purpose for which they traveled all the way across the country for the reference hearing. Moreover, for Gentry to testify his relatives told him of juror misconduct would then leave him vulnerable to the question of why he did not tell his attorneys about that immediately or at any other subsequent time. The trial court's statement has logical flaws, and could have played no important part in the court's essential conclusion that it was unreasonable to believe the relatives would have kept silent about the juror misconduct.

Finally, Gentry argues he could not effectively prepare for the reference hearing without the assistance of an investigator because he needed an investigator to attempt to develop impeachment evidence against the State's witnesses, and to interview the family of the deceased jury foreman to see if they had any information that might have corroborated Perry Gentry's testimony that the jury foreman spoke with Holden after the first day of the penalty phase. Gentry fails to specifically show how this affected his position at the reference hearing where he had access to all of the witnesses to the alleged contact.

Gentry assigns error to several of the trial court's specific factual findings. He contends the dinner at Margaret Blanchard's house occurred on June 29 rather than July 1 and to the trial court's finding that there was a factual discrepancy in the dates of the jail visits of the Gentry family during the penalty phase.[18] He says the trial court should not have relied on Ms. Blanchard's testimony because all of Gentry's other witnesses testified the dinner occurred on July 1, and Ms. Blanchard based her testimony on what Gentry characterizes as "her husband's hearsay recollection." Pet'r's Objections at 2. The points are trivial. Even if the trial court erroneously chose to believe Blanchard rather than the others about the timing of the dinner, her testimony bore very little relation to the central credibility determination. The disputed dates of the jail visits were a similarly trivial point.

Gentry next assigns error to the trial court's failure to

---

[18]Ms. Blanchard testified Gentry's family came to her house on the evening they arrived; that is, on Saturday, June 29, 1991. This was the weekend before the penalty phase of the trial began on Monday, July 1, 1991. She said 16 or 17 people were present, and the atmosphere was upbeat because members of the family had not seen each for some time. She testified there was only one dinner at her house during the time Gentry's family was in Kitsap County for the penalty phase. She said the "dinner was way before the verdict. They hadn't even attended court." Report of Proceedings (Reference Hr'g) at 106.

Ms. Blanchard's testimony as to the time of the dinner directly contradicts Ms. Suluki's testimony that the dinner occurred *after* the first day of the penalty phase. Although this discrepancy in testimony is not significant substantively, as it makes no difference when the dinner actually occurred, it is suggestive that the memories of the witnesses with respect to the timing of events in 1991 might be less than totally reliable.

416

credit the testimony of Perry Gentry. He says: "The Court's findings and conclusions fail to mention that Perry Gentry unequivocally identified the foreperson of the jury, Kelly Horn, as the juror who[m] he observed speaking with the victim's father, Frank Holden, on July 1, 1991." Pet'r's Objections at 5. Gentry is simply wrong. The trial court entered findings of fact 11-14 regarding Perry Gentry's testimony. Contrary to Gentry's implication that the trial court ignored Perry Gentry's testimony, it appears the trial court considered it in some detail, and rejected it because of Perry's failure to mention until November 1997 the juror misconduct he now says he saw in July 1991, with his brother's life hanging in the balance for nearly six and one-half years. The trial court thought it "unreasonable that such an important occurrence would not be told to the Petitioner or his attorneys." Findings of Fact at 7 (Conclusion No. 2).

Gentry assigns error to the conclusion the courthouse routine would have made it difficult for any juror to have contact with Holden or anyone else. He cites the testimony of two of the jurors who said they saw Holden in the parking lot during the trial upon leaving at the end of a court day. Once again, even if the trial court was wrong on this point, it was not a major factor in the ultimate decision.

Gentry has not met his burden of showing no reasonable judge could interpret the conflicting evidence in a way that supports the finding. *Sherrell v. Selfors*, 73 Wn. App. 596, 600-01, 871 P.2d 168, *review denied*, 125 Wn.2d 1002, 886 P.2d 1134 (1994). The trial court had before it the testimony of some members of Gentry's family and the conflicting testimony of the 11 surviving jurors and Frank Holden. The trial court made a credibility determination. Because there was substantial evidence to support the trial court's determination, Gentry's claim of improper juror contact fails.

7. Admission of the Judgment and Sentence of Gentry's Prior Rape Conviction did not Deny Him a Fair Trial

During the sentencing phase of the trial, the State offered, and the trial court admitted without objection from Gentry, a document showing Gentry's 1988 conviction for rape and exceptional sentence of 240 months of confinement. The document went to the jury, along with other documents showing Gentry's criminal history. Gentry argued on direct appeal introduction of this evidence was error.

Gentry now claims ineffective assistance of counsel because the document revealed the sentencing judge for the rape conviction was the trial judge at the murder trial. He asserts the failure to redact the judge's name from the sentencing document allowed or invited the jurors to abandon their responsibility to impose sentence and to defer instead to the judge's prior determination that Gentry deserved an exceptionally high sentence in his prior rape conviction. Gentry contends admitting the judgment bearing the trial judge's name was an unconstitutional comment on the evidence, and his attorneys were ineffective in failing to offer a "redacted" copy without the judge's name. We have already rejected this claim. *State v. Gentry*, 125 Wn.2d at 639. Gentry offers no reason to reconsider that holding, which also prevents him from proving the related ineffective assistance claim.

8. Washington's Death Penalty Statute Is Not Unconstitutionally Vague

Gentry asserts RCW 10.95.060(4) is unconstitutionally vague. We held to the contrary in Gentry's direct appeal. *Gentry*, 125 Wn.2d at 652-53. Gentry makes no attempt to show repeating this argument here satisfies any of the grounds for granting a PRP.

9. Cumulative Error

Finally, Gentry contends that, even if no individual error by itself requires reversal, the cumulative effect of those errors does. We find no errors to cumulate.

418

## CONCLUSION

Gentry has not provided us any reasons to reexamine issues we previously resolved on direct review. Moreover, he has not demonstrated the existence of new issues implicating actual or substantial prejudice to constitutional rights or fundamental errors of law. We deny Gentry's PRP.

GUY, C.J., DURHAM, SMITH, MADSEN, and ALEXANDER, JJ., and DOLLIVER, J. Pro Tem., concur.

SANDERS, J. (dissenting) — The prosecution withheld documents proving Timothy Hicks, a jailhouse informant who testified against Jonathan Gentry, had an incentive to lie about a man on trial for his life. My confidence is shaken that, had the truth been known, at least one of the twelve jurors would have spared Gentry's life. I would therefore yield to controlling Supreme Court precedent, grant the petition, and remand for a new trial on the penalty phase of this proceeding.

In the seminal case of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held prosecutorial disclosure and the due process right to a fair trial go together:

> the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt *or to punishment*, irrespective of the good faith or bad faith of the prosecution.

*Brady*, 373 U.S. at 87 (emphasis added). The requirement is strictly enforced as reversal is required any time evidence is withheld where

> there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A *"reasonable probability" is a probability sufficient to undermine confidence in the outcome.*

*United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (emphasis added).

The rule established by the Supreme Court in *Brady* and *Bagley* holds due process is denied when the information

withheld by the prosecution undermines confidence in the outcome of the penalty phase of the proceedings. Whether the prosecution withheld the evidence in good faith is irrelevant: the touchstone is simply whether withholding the evidence undermines confidence in the outcome. To apply the test, we must therefore consider: (1) the probative value of the material withheld, and (2) the possible effect on the outcome of the proceeding. To reverse, we need not determine that the outcome would necessarily be different, only that our confidence is shaken that it would necessarily be the same.

## 1. Probative Value of Evidence Withheld

At Gentry's trial Timothy Hicks, a jailhouse informant, testified that while he was imprisoned with Gentry, Gentry not only confessed to murdering this young girl, but called her a "bitch," callously blaming the victim by claiming this small child was leading him on. Report of Proceedings (RP) at 4489 (June 4, 1991).[19] Hicks also testified that he received no benefit from the state in exchange for this damning testimony against the accused. RP at 4491 (June 4, 1991). In initial closing arguments the prosecution made much of Gentry's reference to his young victim as a "bitch," using the term no less than 13 times. RP at 5400-19 and 5542-43 (June 25, 1991). The prosecution's emphasis of the word "bitch" added nothing to its proof of Gentry's guilt. However, it would inflame the listener's anger at Gentry for further demeaning his innocent victim by referring to her in such a cold and remorseless way, thus increasing the likelihood that the jury would find no mercy in their hearts for such a callous killer. The prosecution also asserted Mr. Hicks must be believed because "[h]e didn't try to hide anything from you. He's not getting anything. He

---

[19]Leonard Smith also testified that Gentry referred to the young victim as a "bitch." RP at 14 (June 3, 1991). However, Smith came forward to testify as a direct result of Hicks's statements to authorities. RP at 31 (June 3, 1991). Smith also admitted to owing Hicks money in the past. RP at 21 (June 3, 1991). If the defense had possessed the letter that Hicks wrote to prosecutors, it is possible that they could have used that letter to damage Smith's credibility in addition to damaging Hicks's credibility.

didn't ask for anything," RP at 5545 (June 25, 1991), and further elaborated that "[t]he defense can show absolutely no bias and no reason why Timothy Hicks came forward, except that the defendant told him about it at that card table in Shelton, Washington." RP at 5545-46 (June 25, 1991). Of course, in truth, the defense could make no such showing because the prosecution withheld important information the defense could have used to impeach Hicks.

In closing arguments in the penalty phase the prosecution again emphasized that Gentry had referred to his victim as his "bitch," potently juxtaposing Gentry's cruelty and callousness against the powerful image of an innocent young girl picking flowers: "[a]nd what you saw and what you heard at the guilt phase was not that Cassie Holden was this defendant's bitch, but that she was a little girl, out looking for some flowers." RP at 5798 (July 2, 1991). This image would likely sway the mind of even the most merciful juror toward imposition of the death penalty.

Long before Gentry's trial his attorneys demanded the state disclose all information "within its knowledge, possession or control, or which by the exercise of due diligence, might become known to it":

10. To indicate the relationship, if any, of the government's witnesses to the prosecuting authority.

11. To state whether or not an informant was involved and whether he/she will be called as a witness at any hearing or trial in this matter. To state the name and address of the informant or claim and defend the privilege of non-disclosure. If the informant does testify, *defendant specifically requests that the government disclose the full extent of any cooperation and/or plea agreement entered into with the informant including identifying the full range of any benefits which the government has orally or in writing agreed to confer upon the informant explicitly or implicitly in return for his or her cooperation and testimony.* To state whether the informant was under investigation for any criminal offense, charged with any criminal offense, awaiting sentencing upon

conviction for any criminal offense, or on community supervision, probation or parole at the time of the alleged offense.

Clerk's Papers (CP) at 194, 196 (emphasis added). To this request for disclosure the state responded with a single word—"None." CP at 215.

But unbeknownst to Gentry's defense team, on April 8, 1991, the Kitsap County prosecuting attorney received a letter from Hicks. The prosecutor now claims he was not required to disclose this letter because Hicks was "not asking me for a benefit, he's asking a question." First Am. Personal Restraint Pet., Ex. 29, at 16. But we, and the reader, can now easily test the truth of this rationale for nondisclosure by simply reading the letter, reproduced here in full:

Dear Sir,

I still have "great" concern over my parole status. I have no intentions of "boxing" myself into a compromising situation. Month after month I review the results of the parole board's actions on people's cases. Some of these cases are not unlike my own. Many times these people are given additional years to do as a result of being found un-parol[ ]able by the parole board. I am in limbo, I have no idea of the intention of the board towards my case.

As you know, I have voiced these concerns to you on the phone.

[page] 2

One day while working on the passenger boat; I had the chance to speak to Parole Board member Carlson. I explained my circumstances (my case) he "thought" I would not see them again since my parole was never violated.

Could you "please" contac[t] Mr. Carlson at the Parole Board and obtain the official position of the board. Will I have to see them before I get out in March 1993. *If I do, I have tremendous reservations testifying in the Gentry Case. I "need" to know where I stand before I go to court. I can't go to court,*

*and say what is true and correct, with the possibility of spending 3 or 4 years "inside" a*

[page] 3

*major institution.* You see, I am less than 3 years to my release date, that factor is what affords me minimum custody status. If the board gives me more time, I would be sent back inside. Life would not be pleasant if that happened.

I am not backing out on my position on the Gentry Case. My Values and commitment are steadfast. My concerns are genuine; please help me understand my position by contacting the board.

*This is all I ask for my appearance in court.*

If you wish, we possibly could talk on the phone again.

Respectfully

Tim Hicks

Resp. to Personal Restraint Pet. and Authorities, App. O (emphasis added) (Letter written by Tim Hicks to Kitsap County Prosecuting Attorney (date-stamped "Received" Apr. 8, 1991)).

Contrary to the majority's claim that "[t]here is . . . no circumstantial evidence the informants benefited from their testimony" as all informants had been sentenced prior to testifying (Majority at 398), the record before us clearly shows upon receipt of Hicks's letter the prosecutor telephoned the Department of Corrections (First Am. Personal Restraint Pet., Ex. 29, at 16), and immediately following this call the Indeterminate Sentence Review Board in fact changed Hicks's parole status to his benefit. First Am. Personal Restraint Pet., Ex. 45. It further appears, without dispute, that although the prosecutor provided Gentry's lawyers some information about Hicks in a letter of April 10, 1991 (First Am. Personal Restraint Pet., Ex. 11), the prosecutor did *not* disclose the Hicks letter of April 8, nor even acknowledge its existence. In fact the letter was not discovered by Gentry's attorneys until

after Gentry's trial and the consequent imposition of the supreme penalty.

The withheld letter speaks for itself. Hicks threatened not to testify absent assistance from the prosecutor. Admittedly the letter prompted that assistance and the assistance yielded results positive for Hicks.[20] Had the defense possessed this information at the time of trial undoubtedly it would have used it in a serious effort to attack Hicks's credibility. Even if the prosecutor did not perceive his telephone call to the Department of Corrections as actually providing a "benefit" to Hicks, from Hicks's perspective a causal relation between his testimony and favorable treatment would have been a more than reasonable inference, thus providing an arguable incentive to misrepresent the facts regarding Gentry for selfish gain. But nondisclosure denied the defense this basis for impeachment. And not only was the letter withheld from the defense, but in closing the prosecution capitalized on its own nondisclosure by arguing Hicks did not get anything for his testimony and had no ulterior reason for coming forward beyond good citizenship.

## 2. Possible Effect on Outcome

Although Smith and Dyste testified that Gentry used the word "bitch" to describe his victim (RP at 14 (June 3, 1991); RP at 4440 (May 31, 1991)), neither had previously so stated to the police as evidenced in the police reports, and Gentry was able to attack their credibility on that basis. RP at 5475 (June 25, 1991). However, as the prosecution pointed out, the "bitch" testimony *was* foreshadowed by the police report of Hicks's anticipated testimony. RP at 5543 (June 25, 1991). Thus absent the suppressed letter the defense was without a strong basis to challenge the credibility of this key witness.

---

[20]As a direct result of the prosecutor's telephone call Hicks's parole was reinstated, retroactive for five years. Shortly after the reinstatement of his parole, Hicks was transferred from a correctional institution (McNeil Island) to a work release facility (Tacoma Pre-Release). This transfer was based in part on "a supportive letter from Kitsap County," the county prosecuting Gentry. First Am. Personal Restraint Pet., Exs. 45, 46, 47, and 48.

Under *Brady* we must ask whether the failure to disclose Hicks's letter to Gentry's defense undermines judicial confidence in the outcome. "Undermine" means "to weaken or ruin by degrees." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2489 (1981). *Brady* therefore asks not whether the outcome would probably have been different if the evidence had not been withheld, but merely whether our confidence in that outcome is weakened. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.").

If at the death penalty phase of these proceedings Hicks's testimony could have affected the decision of but a single juror, the standard has been met. Had each juror believed Hicks as the prosecution urged (and they probably did given the outcome) each could well have been more inclined to impose death based on a well-founded and unrebutted belief that Gentry was a cold, calculating and remorseless killer who, even after the death of his innocent child victim, would demean her as a "bitch." The prosecution argued such a man merited no mercy—and we now know for a fact no mercy he received. *See State v. Lord*, 117 Wn.2d 829, 907, 822 P.2d 177 (1991) ("While he [the defendant] acknowledged doing 'terrible' things in his life, he showed no remorse for any of his crimes. There was sufficient evidence for a rational trier of fact to find that leniency was not merited."), *cert. denied*, 506 U.S. 856 (1992).

When a jury is asked to consider imposing the death penalty it deliberates the question: "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" RCW 10.95.060(4). Each juror must answer the question in the affirmative before the death penalty is imposed. *Id.* A change of heart by even a single juror will spare the life of

the accused. This is necessarily a very subjective exercise, dependant upon the values, attitudes and beliefs of each juror as applied to the evidence before him or her. Unlike evidence to establish guilt, the basis of the decision each juror must make on the death penalty issue cannot be objectively quantified. The jury may consider "any relevant factors" in reaching its determination. RCW 10.95.070. As each deliberates his or her individualized answer to the question, each juror will likely consider different factors to be most relevant and will likely weigh each factor differently. Therefore, when impeachment information about an inflammatory witness is withheld, one cannot determine with certainty from the remote view of the appellate court, on a cold record, whether presentation of the evidence would have induced any one jury member to change his or her mind, thus sparing the petitioner's life. Therefore it must be concluded withholding such information "undermines confidence" in the outcome of the penalty phase of the proceedings.

### 3. Letter Not Otherwise Obtainable

As a fallback the majority would deny the condemned a fair trial by relying upon our statement in *Benn* that there is no *Brady* violation " 'if the defendant, using reasonable diligence, could have obtained the information' at issue." *In re Personal Restraint of Benn*, 134 Wn.2d 868, 916, 952 P.2d 116 (1998) (quoting *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994)).

In *Williams* the defense argued *Brady* was violated when the prosecution failed to provide the full text of a witness's statement. Similarly in *Benn* we rejected a claim that *Brady* was violated when a summary of a fire marshal's report had been produced, but the whole text of the report had not. In both instances we held because the defendant could have obtained the information with reasonable diligence, there was no *Brady* violation.

Here, the majority claims the *Benn* rationale excuses the nonproduction because the prosecution provided defense

attorneys with Hicks's criminal history. But criminal history is no substitute for the letter and it would require much more than "reasonable diligence" to discover even the existence of Hicks's letter secreted in prosecution files, much less obtain it, from simple disclosure of Hicks's criminal history.

Unlike *Benn* and *Williams* wherein the defendants were supplied with a summary of the document they claimed to be improperly withheld, Gentry's attorneys were not supplied with such a summary, nor were they provided any indication the letter even existed. To the contrary, based on the categorical denial of the prosecution, Gentry's attorneys were entitled to rely on the prosecution's response that no such documents even existed. Defense lawyers are entitled to trust the honesty of their adversaries. RPC 3.8(d); *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) ("[A]n incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defense might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984))).

Given the prosecution's misleading responses to specific requests made by the defense, more than "reasonable diligence" would have been required to discover the letter from Mr. Hicks to the prosecutor on the basis of criminal history. In fact, it would have been impossible.

I would grant the personal restraint petition, and remand for a new penalty trial based upon constitutionally adequate disclosure of the facts and circumstances associated with this proceeding.

JOHNSON, J., concurs with SANDERS, J.

Reconsideration denied June 30, 1999.