# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IN RE THE PERSONAL RESTRAINT PETITION OF: | No. 49251-2-II |
| STEVEN HESSELGRAVE, | |
| Petitioner. | UNPUBLISHED OPINION |

SUTTON, J. — Steven L. Hesselgrave was convicted of raping his former stepdaughter, S.L.,[1] and filed this petition for personal restraint (PRP) after his conviction for first degree child rape was affirmed on direct appeal. Hesselgrave claims: (1) that the prosecutor's misconduct during closing argument violated his right to a fair trial, his right to counsel and right to confront witnesses; (2) the trial court erred by allowing opinion testimony on the credibility of S.L. and Hesselgrave's guilt; (3) the trial court erred when it commented on the evidence during voir dire, denying Hesselgrave's right to a fair jury trial; (4) appellate counsel was ineffective because he failed to raise the above issues on direct appeal; (5) the jury's special verdict finding of domestic violence cannot be sustained because the jury could have found that the rape occurred when Hesselgrave was no longer S.L.'s stepfather; and (6) the sentencing court failed to make an individualized inquiry into Hesselgrave's current and future ability to pay the court imposed

---

[1] Pursuant to General Order 2011-1, the name of the minor will be indicated with initials. Gen. Order 2011-1 of Division II, *In Re the Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash. Ct. App.). http://www.courts.wa.gov/appellate_trial_courts/.

discretionary legal financial obligations (LFOs). We deny the PRP in part because all of Hesselgrave's claims fail, except for his LFO claim. Accordingly, because the sentencing court erred, we grant the petition in part as to the LFOs, we reverse the discretionary LFOs, and remand to the sentencing court for consideration of Hesselgrave's current and future ability to pay.

FACTS

I. BACKGROUND

Leona Ling, S.L.'s mother, and Hesselgrave separated in 2007. IV VRP at 388. Six-year-old S.L. lived with Hesselgrave full-time from March through September 2009. V VRP at 560. S.L. spent one night at Hesselgrave's apartment in October 2010. IV VRP at 382.

> In 2011, S.L. was an eight-year-old female student attending elementary school. . . . One May afternoon, S.L. disclosed sexual abuse by her step-father. . . . [T]he school counselor[] reported the matter to Child Protective Services (CPS). CPS social worker Christine Murillo conducted a "safety interview" with S.L. on May 17, during which S.L. disclosed sexual abuse by her stepfather. On May 25, Cornelia Thomas, an employee of the Child Advocacy Center in Pierce County, conducted a forensic interview with S.L. S.L. made several detailed disclosures to Thomas that involved allegations of oral, vaginal, and anal intercourse. . . . According to Thomas, S.L. maintained sufficient memory to have an independent recollection of the [abuse], S.L.'s statements describing the [abuse] appeared to be based on her perception, S.L. communicated "quite well," and S.L. was able to distinguish truth from lies.

> On the night of [one] incident, Hesselgrave also showed S.L. magazines depicting naked women, in addition to a video on his computer which featured an elephant touching a woman's vagina. S.L. declared that on the same night, Hesselgrave woke up her brother, J.H.,[2] told him to take off his clothes, and instructed S.L. to bite J.H.'s penis, a request with which S.L. complied.[3]

---

[2] J.H. is S.L.'s half-brother and Hesselgrave's biological son. J.H. would have been either five or six at the time of the alleged abuse.

[3] J.H. testified that he had no recollection of this incident.

On June 2, Detectives Jennifer Quilio and Brad Graham interviewed Hesselgrave at police headquarters. When asked if there was any reason that S.L. may have seen his penis, Hesselgrave responded that it was possible because he watched pornography at night in the living area of his apartment when he thought the children were sleeping. Hesselgrave surmised that S.L. could have woken up and inadvertently seen him masturbating. Aware of S.L.'s allegations, Detective Quilio asked Hesselgrave whether he viewed pornography that contained images of animals and women engaging in sexual acts. Hesselgrave admitted that he did, but claimed that he had never seen a video involving an elephant. Hesselgrave denied any sexual contact with S.L.

The day after his police interview, Hesselgrave told [] Ling[4] . . . that she would never see him again and that he was leaving with their sons. Ling then called 911 to report what she believed to be an imminent kidnapping. Patrol officers arrested Hesselgrave. The State charged Hesselgrave with first degree rape of a child [under] RCW 9A.44.073.[5]

*State v. Hesselgrave*, noted at 184 Wn. App. 1021, 2014 WL 5480364, at *1-2.

## II. PROCEDURE

### A. VOIR DIRE

At the beginning of voir dire, the trial court asked jurors about their prior jury experiences. The trial court asked a juror who had sat on an arson case, "[W]as there direct evidence? Did anybody see the fire being set?" II Verbatim Report of Proceedings (VRP) at 107. When the prospective juror responded, "No," the trial court asked a series of questions:

---

[4] Ling is also the mother of Hesselgrave's two sons.

[5] RCW 9A.44.073 provides,

1) A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim.

2) Rape of a child in the first degree is a class A felony.

> Did that create any problems, no eyewitnesses?
>
> . . . .
>
> Was the jury able to reach a decision ultimately?
>
> . . . .
>
> You were probably given an instruction on what is called circumstantial evidence?
>
> . . . .
>
> Were [there] jurors who said that they really needed to see somebody who was there and saw it?

II VRP at 107-08. The trial court then stated,

> That's actually often a problem in cases. There often aren't eyewitnesses. [There] aren't videotapes of a lot of things. In fact, as you might imagine, in child abuse cases, frequently there isn't a lot of eyewitness testimony.

II VRP at 108.

B. MOTIONS

Hesselgrave requested a motion in limine to exclude law enforcement witnesses from testifying that they believed the alleged victim, S.L. The trial court granted the motion and excluded all witnesses from testifying as to whether they believed S.L.

Just before S.L. testified, the State requested the court to allow S.L. to hold a ball while she testified. The trial court asked both counsel if either planned to ask S.L. about the ball if he allowed her to hold it while she testified. Both counsel agreed that they would not. As to potential prejudice, the trial court stated, "I don't know what the prejudice is if no one mentions it. If she comes in carrying something, nobody says anything about it." III VRP at 304. The trial court granted the motion.

4

C.  TESTIMONY AT TRIAL

    1.  S.L.

S.L. testified at trial consistently with her disclosures to Murillo and Thomas. *See Hesselgrave*, 2014 WL5480364, at *1 ("S.L. testified consistently with these disclosures at trial."). S.L. held the ball during her testimony and neither counsel asked her about it.

    2.  Expert Witness Thomas

Forensic interviewer Thomas testified regarding her interview with S.L.  The State began with general questions concerning her training, experience, and child interview methods and protocol.  Thomas responded that the methods she described are generally accepted in the scientific community of forensic interviewing and that she passed accreditation based on those methods and national standards.  The State then asked Thomas if she was trained to be alert for "coaching."  VI VRP at 673.  Thomas testified that she was and explained what coaching is and what, in her experience, were indicators of coaching, including a lack of spontaneous comments during the disclosure.

At the close of Thomas's direct examination, the prosecutor asked Thomas about the video she reviewed in court of her interview with S.L., "So now that you reviewed the tape with us in court and you were present during the interview, did you see any evidence or indicators of coaching?"  VI VRP at 681.  Thomas responded, "No," and Hesselgrave objected that the question asked the witness to state an opinion regarding S.L.'s credibility.  VI VRP at 681.  The trial court overruled the objection stating that Hesselgrave can inquire on cross-examination.

No. 49251-2-II

At the beginning of cross-examination, Hesselgrave asked Thomas about coaching.[6] Hesselgrave specifically asked Thomas about whether she knew if S.L. was coached: "So you don't know [if] there was any coaching or not?" VI VRP at 682. Thomas responded, "Correct." VI VRP at 682. Hesselgrave then asked whether it was possible that a well-coached child would "get right past" Thomas. VI VRP at 682. Thomas responded, "It's possible." VI VRP at 683.

D. JURY INSTRUCTIONS

As to expert testimony, the trial court instructed the jury that

[a] witness who has special training, education, or experience may be allowed to express an opinion in addition to giving testimony as to facts.

You are not, however, required to accept his or her opinion. To determine the credibility and weight to be given to this type of evidence, you may consider, among other things, the education, training, experience, knowledge, and ability of the witness. You may also consider the reasons given for the opinion and the sources of his or her information, as well as considering the factors already given to you for evaluating the testimony of any other witness.

Clerk's Papers (CP) at 209 (Jury Instr. No. 4).

As to the charge of rape of a child, the trial court instructed the jury that

[t]he State alleges that the defendant committed acts of rape of a child in the first degree on multiple occasions. To convict the defendant on any count of rape of a child in the first degree, one particular act of rape of a child in the first degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of rape of a child in the first degree.

CP at 214 (Jury Instr. No. 9).

---

[6] The defense theory was that Ling coached S.L. to fabricate the allegations against Hesselgrave so that Ling could have full custody of their sons and reduce her parental support payments.

The trial court provided the jury with a special verdict form which asked the jury, "Were the defendant, STEVEN L. HESSELGRAVE, and S.L. members of the same family or household?" CP at 221. The trial court instructed the jury,

> For purposes of this case, "family or household members" means persons who have a biological or legal parent-child relationship, including stepparents and stepchildren, and grandparents and grandchildren.

CP at 219 (Jury Instr. No. 13). The trial court also instructed the jury that

> [i]f you find the defendant guilty, you will then use the special verdict form and fill in the blank with the answer "yes" or "no" according to the decision you reach. In order to answer the special verdict form "yes," you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you unanimously agree that the answer to the question is "no," or if after full and fair consideration of the evidence you are not in agreement as to the answer, you must fill in the blank with the answer "no."

CP at 218 (Jury Instr. No. 12).

E. CLOSING ARGUMENT

The prosecutor used a PowerPoint presentation containing 62 slides during closing argument. Slide 4 stated, in relevant part, "Didn't see the defendant come to wake her up....only heard his footsteps." Resp. to PRP, App. D (slide 4) (emphasis omitted). During this portion of the slide presentation, the prosecutor argued,

> Look at some of the things that [S.L.] says, that when the defendant came to wake her up in order to rape her, what would be the easy thing to say? I was asleep; I didn't even notice. Or, I saw him coming; he was scary. No.

> But what did she say on the stand? She didn't see the defendant coming to wake her up; she heard his footsteps. Does that sound like something that just built in as a supporting detail in her elaborate story?

VII VRP at 924. Hesselgrave did not object.

7

Slide 5 stated the elements of the charged crime displayed as follows:

Rape of a Child in the First Degree

1.  Between July 11, 2008, and December 31, 2010, **the defendant had sexual intercourse with S.L.**

2.  S.L. was less than 12 years old and not married to the defendant

3.  Defendant was at least 24 months older

4. Washington State

Resp. to PRP, App. D (slide 5).  During this slide, the prosecutor argued to the jury,

So what is rape of a child in the first degree?  There is an instruction in your packet. It starts out "to convict."  This is what I call the road map instruction.  It's like a checklist.  It's got all the elements, and you go down and you say did the State prove this, did the State prove this, did the State prove this. And if you put a checkmark by every element, then you must return a verdict of guilty.

So here are the elements:  That between July 11th, 2008, and December 31st, 2010, the defendant had sexual intercourse with S.L. . . . That [S.L.] was less than 12 years old and not married to the defendant, that he was at least 24 months older, and that this happened in Washington State.  That's it.  Those are our elements.

VII VRP at 925.  Hesselgrave did not object.

Slides 8 through 10 stated the statutory definitions of sexual intercourse.  All three slides showed the words "SEXUAL INTERCOURSE" as the heading and used smaller font describing sexual organs and acts.  Resp. to PRP, App. D (slide 8-10).  Slide 10 stated:

. . .any act of sexual contact between persons involving the sex organs of one person and the <u>MOUTH</u> or anus of another.

• This is: mouth on penis OR mouth on vagina (penetration irrelevant)

Resp. to PRP, App. D (slide 10).  When showing slide 10, the prosecutor stated, "I highlighted the word 'mouth' because that's the key to this third one."  VII VRP at 927.  Slide 9 had underlined the word "object" as the key part of that definition.  Resp. to PRP, App. D (slide 9).  And slide 8

italicized the word "penis" as the distinguishing element of that definition. Resp. to PRP, App. D (slide 8). After slide 10, the prosecutor stated, "If you believe as a jury that any one of those things have happened, then your verdict is guilty. You don't have to agree that they all happened." VII VRP at 928. Hesselgrave objected to the prosecutor's remarks as misstating the State's burden. The trial court sustained the objection.

The prosecutor continued, "You have to unanimously agree that one of those things happened. [Paraphrased the acts defining sexual intercourse]. You don't have to agree that they all happened. You just have to unanimously agree that any one of those things happened." VII VRP at 928. Hesselgrave objected again, stating that the proper standard is agreeing beyond a reasonable doubt. The trial court agreed that the standard was beyond a reasonable doubt and that the jury instructions reflected that standard. The trial court did not expressly rule on the objection but indicated for the State to continue. The prosecutor stated, "Correct, it's in your instructions. It was in the voir dire. Everyone knows the burden is beyond a reasonable doubt. We'll talk about that later." VII VRP at 929.

The prosecutor then moved on to address the defense's theory that S.L. was making the allegations up. Slide 25 appeared as follows:

[S. L.]

- Manner while testifying
- Scared
- Hid from the defendant; didn't want to look over at him to say if his suit had stripes
- How should she behave

Resp. to PRP, App. D (slide 25). The prosecutor asked the jurors to consider S.L.'s demeanor in court in light of the fact that there were "two lawyers asking a ten-year-old every

9

question that they can think of." VII VRP at 931. Defense counsel objected that this remark

violated the trial court's order granting the motion in limine to exclude argument about the

attorneys doing their job. The trial court overruled the objection.[7] When the prosecutor continued

by stating that the two attorneys questioned S.L. for "hours on end," defense counsel objected and

the trial court sustained the objection. The prosecutor continued:

> Let's talk about the length of time. How long was her conversation with [her friend, the first disclosure]? Maybe a minute. How long was her conversation with Christina Murillo [for the safety interview]? Maybe 15 minutes. How long was her forensic interview? About 40 minutes. And how long was her testimony in court? Probably about one to two hours or more.
>
> The location, obviously, is going to dictate how much of the disclosure she's going to give up and the training of the people that are asking the questions.

VII VRP at 932. The prosecutor went on to describe S.L.'s level of detail during each disclosure—

the safety interview, the forensic interview, and then, finally, in her interview with the defense

attorneys. The prosecutor continued, arguing:

> So think about her manner while testifying. She was scared. She was nervous. She had her little cush ball. Now, remember when I asked her, tell me about the defendant's suit; did it have stripes or no stripes. She said she didn't know because she was ducking behind the counter. And I asked her, [d]o you want to look over so you can tell me about his suit? And she said no. She didn't want to look.
>
> Does that look like somebody who wants to throw somebody under the bus? No. That is somebody that is honestly freaked out that their father figure did this to them and they have to sit here and tell 12 strangers about it. How should she behave?

VII VRP at 936. Hesselgrave did not object.

---

[7] The court granted Hesselgrave's motion in limine to exclude testimony that Hesselgrave requested an attorney.

No. 49251-2-II

At the close of the prosecutor's argument, the prosecutor presented slide 55. Slide 55 stated

"**GUILTY**" in big, bold font in the center of an otherwise blank slide. Resp. to PRP, App. D (slide

55). As he presented this slide, the prosecutor argued to the jury,

> You have a duty, a responsibility, to evaluate this case, evaluate the evidence, and follow the law. Make sure that you evaluate it, but if you find that the State has proved its case beyond a reasonable doubt, your job is to return a verdict of guilty.

VII VRP at 948. Defense counsel did not object to the slide or the argument.

At the close of rebuttal, the prosecutor also presented a slide that stated "REASONABLE

VERDICT" and "**GUILTY**," with guilty in big, bold font. Resp. to PRP, App. D (slide 62). While

showing this slide, the prosecutor stated,

> Review the evidence, and remember how she was on the stand when she described it and ask yourself, is that ten-year-old girl pulling the wool over my eyes or is that a ten-year-old girl describing something no ten-year-old girl should ever have to? Find him guilty.

VII VRP at 978-79. Hesselgrave did not object to the slide or this argument.

F. MOTION FOR MISTRIAL AND VERDICT

After the trial court released the jury to deliberate, Hesselgrave objected to the State's slide

presentation:

> The State used a slide presentation. I would like the slide presentation filed and receive a copy of it. I think it was objectionable. It was burden shifting, misstated the standard, and there was a moment on the video where it said the witness was telling the truth. I think those are three objectionable bases. I would like to get that filed, and when my client is here, I'll move for a mistrial.

VII VRP at 985. Immediately before the jury was brought in to deliver their verdict, Hesselgrave

moved for a mistrial, repeating his objection to the State's slide presentation and closing argument:

> I think the State's closing argument was improper. I think the slide show they used was burden shifting, used the wrong standard, and one of the slides said that [S.L.]

11

was telling the truth, and that, I think, is very problematic. It vouches for a witness. And even though the State didn't say it out loud, it was very clear on the screen.

VII VRP at 988. The trial court denied his motion for a mistrial and directed the State to file the slide presentation with the court.

The jury found Hesselgrave guilty as charged. The jury also found that Hesselgrave and S.L. were members of the same family or household.

G. SENTENCING AND APPEAL

The sentencing court did not make an individualized inquiry into Hesselgrave's current and future ability to pay the LFOs. The sentencing court ordered Hesselgrave to pay discretionary LFOs of $1,500 for court appointed attorney fees and defense costs.[8]

Hesselgrave appealed his conviction and this court affirmed. *Hesselgrave*, 2014 WL5480364. Hesselgrave filed this timely petition on June 16, 2016.

ANALYSIS

I. STANDARD OF REVIEW

"A [PRP] is not a substitute for direct appeal and availability of collateral relief is limited." *In re Pers. Restraint of Grasso*, 151 Wn.2d 1, 10, 84 P.3d 859 (2004). A petitioner must identify facts and admissible evidence that would entitle him to relief. RAP 16.7(a)(2). To be entitled to relief, Hesselgrave must show either a constitutional violation that resulted in actual and substantial prejudice or a nonconstitutional error that constituted a fundamental defect that inherently resulted in a complete miscarriage of justice. *In re Pers. Restraint of Lui*, ___ Wn.2d

---

[8] The court also imposed mandatory LFOs of $500 for victim assessment, $200 for criminal filing, and $100 for DNA collection.

___, 397 P.3d 90, at ¶15 (2017) (citing *In. re Pers. Restraint of Cross*, 180 Wn.2d 664 676-77, 327 P.3d 660 (2014). We determine actual prejudice "'in light of the totality of the circumstances.'" *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 539, 309 P.3d 498 (2013) (quoting *In re Pers. Restraint of Music*, 104 Wn.2d 189, 191, 704 P.2d 144 (1985)). The ultimate question in determining whether the petitioner has been actually prejudiced is whether the error "so infected petitioner's entire trial that the resulting conviction violates due process." *Music*, 104 Wn.2d at 191.

## II. REVIEWABILITY OF NEWLY RAISED ISSUES

As a preliminary matter, the State asserts that we should not address Hesselgrave's allegations of prosecutorial misconduct raised in this PRP because Hesselgrave could have raised these issues on direct appeal but failed to do so. We disagree.

Relying on *In re Personal Restraint of Gentry*,[9] the State argues that we should not reach Hesselgrave's allegations of prosecutorial misconduct in closing because Hesselgrave could have raised them in his direct appeal but failed to do so. Although a petitioner cannot raise an issue in a PRP that was raised and decided on the merits in a direct appeal,[10] this prohibition does not extend to all issues the petitioner could have potentially raised on direct appeal.

The State reads *Gentry* too broadly. In *Gentry*, our Supreme Court addressed whether it must consider "issues already resolved on direct review." 137 Wn.2d at 383-84. In addressing whether it could consider an issue raised and resolved on direct review, the court stated,

---

[9] 137 Wn.2d 378, 388-89, 972 P.2d 1250 (1999).

[10] *Gentry*, 137 Wn.2d at 388; *see also In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994).

We take seriously the view that a collateral attack by PRP on a criminal conviction and sentence should not simply be [a] reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact and law that were not *or* could not have been raised in the principal action, to the prejudice of the defendant.

*Gentry*, 137 Wn.2d at 388-89 (emphasis added). The court stated,

In PRPs, we ordinarily will not review issues previously raised and resolved on direct review. In order to renew an issue rejected on its merits on appeal, the petitioner must show the ends of justice would be served by reexamining the issue.

*Gentry*, 137 at 388. At no point does *Gentry* examine whether a petitioner may raise new, unresolved issues on collateral review if those issues were available to the petitioner but not raised on direct appeal.

Furthermore, in stating that the collateral attack "should not simply be reiteration of issues finally resolved at trial and direct review," *Gentry* is merely supporting its conclusion that a petitioner cannot raise issues in a PRP that were previously raised and decided on the merits. *Gentry*, 137 Wn.2d at 388; *see also Lord*, 123 Wn.2d at 303 ("[A] personal restraint petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue."). This statement does not suggest that a petitioner is precluded from raising issues that a petitioner could have but did not raise in the principal action, which is what the State is arguing here.

Instead, *Gentry* states that the petition "should raise new points of fact and law that" (1) were not raised in the principal action, *or* (2) could not have been raised in the principal action.[11]

---

[11] Examples of issues that could not have been raised in the principal action include claims based on newly discovered evidence that were not available before the appeal and issues that are outside the record that would not have been considered on direct appeal.

*Gentry*, 137 Wn.2d at 388-89. Nothing in *Gentry* suggests that a petitioner must raise all potential issues on direct appeal or be barred from raising a new issue in a PRP. Thus, we hold that Hesselgrave is not prohibited from raising new issues in his PRP.

We next determine whether Hesselgrave's PRP raises any issues that were addressed and rejected on the merits on direct appeal. Our Supreme Court has clarified what qualifies as a new issue:

> A petitioner may . . . raise new issues on collateral attack, including errors of constitutional or nonconstitutional magnitude. A 'new' issue is not created merely by supporting a previous ground for relief with different factual allegations or with different legal arguments.

*In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004). A petitioner cannot simply recast an issue by supporting it with different legal arguments or using different language to avoid this procedural bar—he must allege a new ground for relief. *See In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 723, 16 P.3d 1 (2001). For instance, in *Stenson*, our Supreme Court initially refused to consider "[w]hat was formerly a substitution of counsel issue" that had been addressed on direct appeal after Stenson "recast [the issue] as a claim of irreconcilable conflict causing ineffective assistance of counsel."[12] *In re Stenson*, 142 Wn.2d at 723. In both claims, the underlying issue remained the same.

On direct appeal, Hesselgrave did not raise any of the issues he is raising now, except for his argument that the prosecutor committed misconduct during closing.[13] In his PRP, he alleges

---

[12] The Court ultimately considered the issue because it found that there had been an intervening change in the law that was sufficient to justify revisiting the issue. *Stenson*, 142 Wn.2d at 724.

[13] *See Hesselgrave*, 2014 WL 5480364, at *1.

different grounds for prosecutorial misconduct during closing, which were not raised or addressed on the merits in his direct appeal.

In his direct appeal, Hesselgrave argued prosecutorial misconduct based on the slide presentation of a "false choice" which, he alleged, resulted in improper burden shifting. *Hesselgrave*, 2014 WL 5480364, at \*9. In his PRP, Hesselgrave raises new prosecutorial misconduct claims based on distinct legal grounds—using inflammatory illustration, stating personal opinion, and commenting on Hesselgrave's right to counsel and to confront witnesses. None of these arguments implicate the same slides or arguments made or decided in the direct appeal. Therefore, we consider the new allegations of prosecutorial misconduct.

### III. PROSECUTORIAL MISCONDUCT

Hesselgrave claims that various acts of prosecutorial misconduct deprived him of his Sixth Amendment right to a fair trial. We disagree that any of these acts were improper. Thus, we reject Hesselgrave's claim of prosecutorial misconduct.

To prevail on a prosecutorial misconduct claim in a personal restraint petition, Hesselgrave must show both improper conduct and that the alleged misconduct was either a constitutional error that resulted in actual and substantial prejudice or a fundamental defect that resulted in a miscarriage of justice. *Lui*, 397 P.3d. at ¶15 (citing *Cross*, 180 Wn.2d at 676-77. We examine the allegedly improper conduct in the context of the total argument, the issues in the case, the evidence, and the jury instructions. *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007).

The right to a fair trial is a fundamental liberty guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, § 22; *Glasmann*, 175 Wn.2d at 703. Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial.

*Glasmann*, 175 Wn.2d at 703-04. A "prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury." *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). "Closing argument provides an opportunity to draw the jury's attention to the evidence presented, but it does not give a prosecutor the right to present altered versions of admitted evidence to support the State's theory of the case." *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976, *cert. denied*, 135 S. Ct. 2844 (2015).

A.  SLIDE PRESENTATION DURING CLOSING ARGUMENT

Hesselgrave claims that specific slides shown to the jury during closing argument were inflammatory and highly prejudicial, relying on *Glasmann* and *Walker*. Hesselgrave also claims that the prosecutor expressed his personal opinion about the credibility of witnesses, compounding the prejudicial impact of the challenged slides. We disagree.

"Attorneys may use multimedia resources in closing arguments to summarize and highlight relevant evidence, and good trial advocacy encourages creative use of such tools." *Walker*, 182 Wn.2d at 476. "'A trial judge must, however, be careful to avoid letting the visual aids be used more for their shock value than to educate.'" *Walker*, 182 Wn.2d 480 (quoting *State v. Strandy*, 49 Wn. App. 537, 541-42, 745 P.2d 43 (1987)). Using slides to visually accomplish what a prosecutor is not allowed to do verbally is improper, and can be even more prejudicial. *Glasmann*, 175 Wn.2d at 708.

1.  Slide 4: S.L.'s Testimony

Hesselgrave claims that the prosecutor altered admitted evidence of S.L.'s testimony by paraphrasing and emphasizing her statements, presenting a slanted version of her testimony. The

State argues it used the slides to summarize and highlight relevant evidence. We agree with the State.

Arguments which encourage a jury to render a verdict based on facts not in evidence are improper. *State v. O'Neal*, 126 Wn. App. 395, 421, 109 P.3d 429 (2005). A prosecutor's recitation of the facts does not need to be a verbatim account of the evidence to be considered supported by the evidence. *O'Neil*, 126 Wn. App. at 421.

Here, the slide in question emphasized S.L.'s testimony that she didn't see Hesselgrave wake her up but heard his footsteps. This slide was consistent with S.L.'s testimony, "I just heard his footsteps." III VRP at 327. The prosecutor's statements were also consistent with this slide: "But what did she say on the stand? She didn't see the defendant coming to wake her up; she heard his footsteps." VII VRP at 924. Thus, the prosecutor was not presenting the jury with new evidence, but was only highlighting parts of her actual testimony. Therefore, we hold that the prosecutor's slide 4 and remarks were not improper and Hesselgrave's argument fails.

2. Slide 5: Elements of the Crime

Hesselgrave claims that the prosecutor committed misconduct by improperly expressing his personal opinion when he presented slide 5 to emphasize that the defendant had sexual intercourse with S.L. when listing the elements of the crime. The State argues that the prosecutor was drawing attention to a specific topic, which is proper, not expressing his personal opinion. We agree with the State.

Here, slide 5 had a heading that stated, "Rape of a Child in the First Degree" then listed the four elements that the State must prove beyond a reasonable doubt, including that between the dates in question "**the defendant had sexual intercourse with S.L.**" Resp. to PRP, App. D (slide

5).  As the prosecutor presented this slide, he stated that the jury could use the elements as a "road map" and ask whether the State had proven each element.  VII VRP at 925.  The prosecutor then read through the elements as presented on the slide.

Although the prosecutor emphasized one element, his slide and statements were not improper.  This element is the crux of the charge against Hesselgrave, and the prosecutor was highlighting it for the jury.  Further, the prosecutor did not substitute Hesselgrave's name in the element, but left it in the generic usage—the defendant.  There was nothing improper about the prosecutor's slide or arguments.  Thus, we hold that the prosecutor's slide 5 and remarks were not improper and Hesselgrave's argument fails.

3.  Slides 8-10:  Statutory Definition of Sexual Intercourse

Hesselgrave claims that the prosecutor committed misconduct by presenting three slides that emphasized sexual intercourse and mouth when listing the statutory definition of sexual intercourse, which emphasis impermissibly interfered with the jury's deliberation.  The State argues that none of the slides used "shouting" graphics like those disapproved of in *Glasmann*.  Resp. to PRP at 8.  We agree with the State.

Hesselgrave relies on *Glasmann* to support his argument that these slides impermissibly interfered with the jury's deliberation.  But the facts in *Glasmann* are not analogous.  In *Glasmann*, the prosecutor used the word "guilty" flashing three times over a photo of Glasmann's face on the final slide before the jury was released to deliberate.  *Glasmann*, 175 Wn.2d at 709.  The court

held that the use of "shouting" graphics[14] were particularly egregious because Glasmann's defense was that he committed a lesser crime, and the jury might not have been able to distinguish the nuanced elements of the crimes given the scope of the prosecutorial misconduct urging the jury to return a guilty verdict. *Glasmann*, 175 Wn.2d at 709-10.

Here, the prosecutor used capitalized letters and underlining to highlight and differentiate between the three definitions of sexual intercourse, not to visually shout at the jury like the prosecutor in *Glasmann*. Slides 8-10 showed the words "SEXUAL INTERCOURSE" and used smaller font describing sexual organs and penetration. Resp. to PRP, App. D (slides 8-10). Slide 10 stated that

> . . .any act of sexual contact between persons involving the sex organs of one person and the <u>MOUTH</u> or anus of another.
>
> • This is: mouth on penis OR mouth on vagina (penetration irrelevant)

Resp. to PRP, App. D (slide 10). Immediately preceding this slide, slide 9 was presented with the word "object" underlined as the key part of that definition. And slide 8 italicized the word "penis" as the distinguishing element of that definition. Slides 8-10 capitalized the words sexual intercourse for the heading. After slide 10, the prosecutor stated, "If you believe as a jury that any

---

[14] In *Glasmann*, our Supreme Court stated,

> A prosecutor could never shout in closing argument that "Glasmann is guilty, guilty, guilty!" and it would be highly prejudicial to do so. Doing this visually through use of slides showing Glasmann's battered face and superimposing red capital letters (red, the color of blood and the color used to denote losses) is even more prejudicial.

175 Wn.2d at 708.

one of those things have happened then your verdict is guilty. You don't have to agree that they all happened." VII VRP at 928.

Given the context of the closing argument, the issues, the evidence, and the jury instructions, the prosecutor's slides 8-10 highlighted the distinguishing features of each of the three statutory definitions of sexual intercourse. While presenting these three slides to the jury during closing argument, the prosecutor's stated, "I highlighted the word 'mouth' because that's the key to this third one." VII VRP at 927. These slides were not improper. They were not "shouting" graphic slides like those disapproved of in *Glasmann*. And the slides and statements were not improper opinions of guilt. Therefore, we hold that the prosecutor's slides and remarks were not improper and Hesselgrave's argument fails.

4. Slide 25: S.L.'s Thoughts While Testifying

Hesselgrave claims that the prosecutor's slide 25 improperly commented on what S.L. thought as she was testifying. We disagree.

"[C]losing arguments are an opportunity for counsel to argue reasonable inferences from the evidence." *Walker*, 182 Wn.2d at 476-77. An argument based on common sense which does not purport to quote from the evidence is not introducing facts not in evidence. *See State v. Barrow*, 60 Wn. App. 869, 873-74, 809 P.2d 209 (1991); *see also State v. Hartzell*, 156 Wn. App. 918, 943, 237 P.3d 928 (2010).

Here, the slide displayed as follows:

[S. L.]

- Manner while testifying
- Scared
- Hid from the defendant; didn't want to look over at him to say if his suit had stripes
- How should she behave

Resp. to PRP, App. D (slide 25). The prosecutor repeated these statements in his closing arguments arguing that S.L. was scared and nervous, and she declined to look over at Hesselgrave to describe his suit. The prosecutor argued a reasonable inference from the evidence that S.L. was scared and nervous because she had to describe to a room full of strangers what Hesselgrave did to her. The prosecutor did not purport to quote S.L. as saying she was scared and nervous, but was making a common sense argument. The jury heard S.L.'s testimony and could decide for themselves whether the prosecutor's description of S.L. during her testimony was accurate, as the trial court properly instructed them to do.[15] Thus, we hold that the prosecutor's slide and remarks were not improper and Hesselgrave's claim fails.

5. Slide 55 & 62: Guilty

Hesselgrave, citing *Glassman* and *Walker*, claims that the prosecutor committed misconduct by expressing his personal opinion on slides 55 and 62 which read "**GUILTY**" in large letters and bold font and then, on rebuttal, by asking the jury to "find him guilty." Br. of Petitioner at 15. We disagree.

---

[15] The trial court instructed the jury that statements by the attorneys are not evidence and that the jury is the sole determiner of witness credibility.

A prosecutor may properly argue that a defendant is guilty. *See State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). Counsel, however, is expressly prohibited from stating a personal opinion "'on the guilt or innocence of an accused.'" *Walker*, 182 Wn.2d at 478 (quoting RPC 3.4(e)). In *McKenzie*, our Supreme Court stated,

> "It is not uncommon for statements to be made in final arguments which, standing alone, sound like an expression of personal opinion. However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence. Prejudicial error does not occur until such time as it is *clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion*."

*McKenzie*, 157 Wn.2d at 53-54 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)). The Supreme Court further clarified in *Walker* that

> *Glasmann* does not hold that the color red is inherently prejudicial, that the use of all capital letters always constitutes shouting, or that the word "guilty," when presented as a written word in a visual aid, always constitutes an improper expression of the prosecutor's opinion on guilt.

182 Wn.2d at 480 n.6.

In *Walker*, the prosecutor presented approximately 250 slides, with over a 100 of them proclaiming in the heading that Walker is guilty of murder. 182 Wn.2d at 471. *Walker* is not analogous.

Here, the prosecutor used one slide at the end of the presentation with the word guilty in the middle in big, bold font. The prosecutor stated that the jury should evaluate the evidence and if they "find that the State has proved its case beyond a reasonable doubt, your job is to return a verdict of guilty." VII VRP at 948. The prosecutor also presented one slide at the close of rebuttal that displayed "REASONABLE VERDICT" and "**GUILTY**" with guilty in big, bold font. Resp.

to PRP, App. D (slide 62). While showing this slide, the prosecutor stated that the jury should review the evidence and determine if S.L.'s testimony reflected a "ten-year-old girl pulling the wool over my eyes or is that a ten-year-old girl describing something no ten-year-old girl should ever have to? Find him guilty." VII VRP at 978-79. The record reflects that the prosecutor was arguing to the jury that Hesselgrave was guilty based on the evidence; he was not expressing a personal opinion of Hesselgrave's guilt. Therefore, we hold that the prosecutor's slides and remarks were not improper and Hesselgrave's argument fails.

B. COMMENT ON RIGHT TO COUNSEL AND RIGHT TO CONFRONT WITNESSES

Hesselgrave claims that the prosecutor committed misconduct during closing argument by improperly commenting on Hesselgrave's right to counsel and to confront witnesses. Hesselgrave alleges that the prosecutor's comments about defense counsel's examination of S.L. and S.L.'s demeanor in testifying violated the trial court's order to exclude arguments that Hesselgrave sought representation. The State argues that the prosecutor's comments explain why S.L.'s disclosures became more detailed over time and, thus, the comments were not improper. We agree with the State that the comments were not improper.

A prosecutor may not use language that denigrates the right of a criminal defendant to retain counsel, "or otherwise limits the fundamental due process right of an accused to present a vigorous defense." *State v. Espey*, 184 Wn. App. 360, 367, 336 P.3d 1178 (2014).

Here, during closing argument the prosecutor first asked the jurors to consider S.L.'s demeanor in court in light of the fact that there were "two lawyers asking a ten-year-old every question that they can think of." VII VRP at 931. Defense counsel's objection that this argument violated the trial court's motion in limine was overruled. When the prosecutor next argued that

two attorneys questioned S.L. for "hours on end," defense counsel's objection was sustained. VII VRP at 932. The prosecutor then argued that S.L. was in court for one to two hours.

The prosecutor next described S.L. as nervous and scared when she testified, with "her little cush ball." VII VRP at 936. The prosecutor described S.L. as hiding behind the counter when he asked her to describe what Hesselgrave was wearing in court that day. The prosecutor then stated how he asked her if she wanted to look at Hesselgrave and she said, "No." VII VRP at 936.

Nothing about the prosecutor's remarks denigrated or limited Hesselgrave's right to counsel or to confront witnesses against him. Nor did the remarks violate the trial court's order to exclude arguments related to the conduct of counsel. The first set of remarks, taken in the context of the closing argument as a whole, described S.L.'s level of disclosures made during each interview—the safety interview, the forensic interview, and then, the interview with the defense attorneys. The prosecutor's remarks drew a contrast between the level of training of each interviewer and the length of time of each interview.

As to the second set of remarks, S.L.'s demeanor as she testified, the prosecutor was referring to S.L.'s reaction to seeing Hesselgrave in the courtroom, not commenting on Hesselgrave's right to confront S.L. in court. The prosecutor never stated or implied that Hesselgrave should be blamed for putting S.L. through trial. On the contrary, the argument focused on whether S.L.'s reaction to Hesselgrave was indicative of her fear of him due to the alleged crime or whether she was fabricating the story. Because we hold that none of the prosecutor's remarks denigrated or otherwise limited Hesselgrave's right to counsel or to confront witnesses and the prosecutor's remarks were not improper, Hesselgrave's argument fails.

25

Further, the prosecutor's reference to S.L. holding a ball did not violate the court's ruling that counsel was not allowed to ask her about the ball during examination. The trial court asked counsel if either planned to ask S.L. about the ball if he allowed her to hold it while she testified. Counsel agreed they would not. As to potential prejudice, the trial court stated, "I don't know what the prejudice is if no one mentions it. If she comes in carrying something, nobody says anything about it." III VRP at 304. The prosecutor did not ask S.L. about the ball during her testimony, but did refer to her holding the ball during his closing arguments. We hold that this was not improper because the prosecutor did not ask S.L. about the ball when she was on the stand. Therefore, we hold that the prosecutor did not commit misconduct and Hesselgrave's argument fails.

IV. EXPERT OPINION TESTIMONY

Hesselgrave claims that Thomas's expert opinion testimony, that S.L. had not been coached, constitutes vouching and an improper comment by a witness on S.L.'s credibility and violated the trial court's order to exclude any witness from testifying that they believed S.L. Hesselgrave further claims that Thomas's opinion was not an expert opinion, but rather a personal opinion, because it was not based on a scientifically reliable theory. Finally, Hesselgrave claims that because S.L.'s credibility was a key issue at trial, that this error and its resulting prejudice were compounded when the prosecutor relied extensively on Thomas's opinion testimony—that S.L. was not coached—in the slide presentation during closing argument. We disagree.

An expert is permitted to testify on subjects that are not within the common understanding of the average person. *State v. Montgomery*, 163 Wn.2d 577, 590, 183 P.3d 267 (2008) (citing ER 702).[16]  An expert is allowed to testify in the form of an opinion based on their field of expertise when their opinions will assist the trier of fact. *Montgomery*, 163 Wn.2d at 590 (citing ER 701 and 702).[17]  The mere fact that expert opinion testimony addresses an issue that the jury has to decide does not call for automatic exclusion. *Montgomery*, 163 Wn.2d at 590.  In criminal trials, "expressions of personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses" constitute improper opinion testimony. *Montgomery*, 163 Wn.2d at 591.

Here, Thomas's opinion testimony as to whether S.L. had been coached was admissible as expert opinion testimony under ER 702.  Thomas testified that her methods were based on national standards that were generally accepted in her field of expertise.  Thomas's testimony on coaching was within her expertise, was a subject matter that the average person may not understand, and was provided to assist the jury.  Thomas did not state her personal belief as to whether S.L. was

---

[16] ER 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[17] ER 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702.

telling the truth, nor whether she believed S.L.; nor did Thomas state that she believed that S.L. was not coached. Instead, Thomas responded that, based on her experience, she did not "see any evidence or indicators of coaching." VI VRP at 681. On cross-examination, Thomas admitted that it was possible that S.L. was coached. Further, the trial court properly instructed the jury that they did not need to accept the expert's opinion. Therefore, we hold that Thomas's testimony was not improper opinion testimony and Hesselgrave's arguments fail.

### V. COMMENT ON THE EVIDENCE DURING VOIR DIRE

Hesselgrave claims that the trial court erred by commenting on the evidence during voir dire, denying him his right to a fair jury trial. We disagree.

A judge is prohibited by article IV, section 16 from "'conveying to the jury his or her personal attitudes toward the merits of the case.'" *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006) (quoting *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997)). Judicial comments are presumed to be prejudicial, and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted. *Levy*, 156 Wn.2d at 725.

Here, the record does not support Hesselgrave's contention that the trial court commented on the merits of the case. During voir dire, the trial court stated that the lack of eyewitness testimony can be a problem in some cases, especially in child abuse cases when there often isn't a lot of eyewitness testimony. This statement was preceded by a discussion of direct and circumstantial evidence with the prospective jurors and their experiences on various criminal cases. II VRP at 107-08. The trial court did not comment on the merits of the case. In fact, the evidence in this case involved a significant amount of eyewitness testimony. The jury heard S.L.'s

testimony in court and her two prior, recorded disclosures during the safety interview and forensic interview. Therefore, we hold that the trial court did not err.

## VI. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Hesselgrave claims that if we determine that Hesselgrave cannot meet the collateral attack standard for any of the above claims, then he received ineffective assistance of appellate counsel because he could have met the lower standard on direct appeal.

"We apply the same prejudice standard to ineffective assistance claims brought in a [PRP] as we do on appeal." *Lui*, 397 P.3d at ¶ 13. To prove ineffective assistance of counsel, Hesselgrave must show that (1) counsel's performance was so deficient that it fell "below an objective standard of reasonableness," and (2) the deficient performance prejudiced him, to the extent that there is a reasonable probability the deficient performance affected the outcome of the trial. *State v. Grier*, 171 Wn.2d 17, 32-34, 246 P.3d 1260 (2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). There is a strong presumption that counsel's performance was reasonable because of the deference we afford to defense counsel's decisions. *Grier*, 171 Wn.2d at 33. Failure to establish either prong is fatal to an ineffective assistance of counsel claim. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653.

Here, because all of Hesselgrave's arguments fail, we hold that Hesselgrave's appellate counsel was not deficient by not raising these claims on direct appeal.

## VII. DOMESTIC VIOLENCE FINDING

Hesselgrave claims that he was not S.L.'s stepfather after he divorced Ling on February 16, 2010; and, thus, he could not be found guilty of the domestic violence allegation if the jury found that the crime took place when he was no longer her stepfather. He claims that the to-convict

instruction included the period of time between July 8, 2008 through December 31, 2010, and the jury was not asked to specify which act they agreed upon for conviction. Thus, he claims that the jury's special verdict finding of domestic violence should be reversed and dismissed. We disagree.

Hesselgrave relies on *Aho*, but the facts in *Aho* are not analogous. *See State v. Aho*, 137 Wn.2d 736, 744, 975 P.2d 512 (1999). The charges against Aho for child molestation were based in substantial part on a charging period which predated the effective date of the child molestation statute, which the court held violated due process. *Aho*, 137 Wn.2d at 744.

Here, however, the trial court instructed the jury that the State alleged Hesselgrave committed acts on multiple occasions, between July 11, 2008 and December 31, 2010. All of the dates in question fell within the statutory effective dates of the child rape statute and, thus, no due process violation is implicated.

Ling and Hesselgrave separated in 2007. Six-year-old S.L. lived with Hesselgrave full-time from March through September 2009. S.L. spent one night at Hesselgrave's apartment in October 2010. The trial court instructed the jury that they had to have unanimous agreement as to which particular act has been proved. As to the special verdict finding of domestic violence, the trial court provided separate instructions to the jury on the special verdict form. Here, too, the trial court instructed the jury that they must reach unanimous agreement on whether Hesselgrave was a family or household member of S.L. to find Hesselgrave guilty of the domestic violence charge. We presume a jury follows the court's instructions. *Emery*, 174 Wn.2d at 766.

Therefore, we hold that the jury's special verdict finding of domestic violence is proper and Hesselgrave's argument fails.

## VIII.  LFOS

Hesselgrave claims that the sentencing court erred by failing to inquire into his current and future ability to pay before ordering him to pay the court imposed discretionary LFOs.  The State argues that this is a non-constitutional error that Hesselgrave did not object to and cannot raise now.  We agree with Hesselgrave that he can raise this claim.

### A.  CHALLENGING LFOS FOR THE FIRST TIME ON APPEAL

"The imposition and collection of LFOs have constitutional implications and are subject to constitutional limitations."  *State v. Duncan*, 185 Wn.2d 430, 436, 374 P.3d 83 (2016).  A defendant who fails to object to the imposition of LFOs at sentencing, however, is not automatically entitled to review.  RAP 2.5(a); *State v. Blazina*, 182 Wn.2d 827, 832, 344 P.3d 680 (2015).  RAP 2.5(a) grants appellate courts discretion to accept review of claimed errors and to reach the merits of the case.  *Blazina*, 182 Wn.2d at 834-35.

Here, Hesselgrave was sentenced on November 9, 2012.  Hesselgrave did not object below and raises the issue for the first time in this petition.  We exercise our discretion and reach the merits of Hesselgrave's challenge.

### B.  INQUIRY INTO ABILITY TO PAY

Our Supreme Court has made clear that under RCW 10.01.160(3), the sentencing court "must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry.  The record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay."  *Blazina*, 182 Wn.2d at 838.

Here, the record shows that the sentencing court did not make an individualized inquiry into Hesselgrave's current and future ability to pay before imposing $1,500 in discretionary LFOs.

Therefore, we hold that the sentencing court erred, we reverse the discretionary LFOs, and remand to the sentencing court for consideration of Hesselgrave's current and future ability to pay.

## CONCLUSION

We deny the petition in part because all of Hesselgrave's claims fail except for his LFO claim. Accordingly, we grant the petition in part as to the LFOs because the sentencing court erred, we reverse the discretionary LFOs, and remand to the sentencing court for consideration of Hesselgrave's current and future ability to pay.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
SUTTON, J.

We concur:

_____
JOHANSON, P.J.

_____
MELNICK, J.